**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| GEOPHYSICAL SERVICES, INCORPORATED, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 14-1368 |
| TGS-NOPEC GEOPHYSICAL SERVICES, | § § § | |
| Defendant. | § § | |

**MEMORANDUM AND OPINION**

I.      **Background**

Geophysical Services Incorporated is a Canadian company that collects seismic data by bouncing sound waves off the ocean floor, recording the information and processing, transcribing, and storing the information as seismic lines. Geophysical licenses the seismic data to oil and gas companies for use in oil, gas, and other hydrocarbon exploration. Geophysical asserts a copyright interest in the seismic data under United States law.

Canadian laws regulating offshore petroleum exploration and extraction require seismic services companies like Geophysical to get a permit before conducting seismic surveys in Canadian waters. One condition for getting a permit is that the company submit copies of the seismic data it obtains from the surveying to the Canadian government. The data is kept confidential for a defined period, then released on specific request. Geophysical followed this regulatory regime in 1983, when it submitted copies of the seismic data generated from its 1982 surveys in Canadian waters to

the Canada-Newfoundland and Labrador Offshore Petroleum Board.[1]

In 1999, TGS-NOPEC Geophysical Services ("TGS"), a Houston company, requested copies of the seismic data that Geophysical had filed with the Board in 1983. Because the confidentiality period had expired, the Board made copies and sent them to TGS at its Houston address. TGS performed seismic surveys at several of the same locations Geophysical had surveyed in 1982. TGS licensed the seismic data it collected to oil and gas companies.

Geophysical discovered TGS's actions in 2013 and sued in May 2014. The complaint alleges that TGS directly and contributorily infringed Geophysical's copyrights in the 1982 seismic data by requesting copies from the Board; making the copies it received from the Board available to third parties; creating derivative works by surveying the locations disclosed in the Geophysical seismic lines to collect its own seismic data, which it licensed to third parties; and licensing and distributing copies of these derivative works without including Geophysical's copyright-management information. (Docket Entry No. 1).

TGS moved to dismiss, arguing that Geophysical's complaint failed to state a claim and was barred by the act-of-state doctrine and by international comity. (Docket Entry No. 10). After briefing and argument, the court granted TGS's motion to dismiss. (Docket Entry No. 28). Geophysical filed an interlocutory appeal challenging the dismissals of the unauthorized-importation basis of its direct infringement claim and the dismissal of the contributory infringement claim. *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 792 (5th Cir. 2017). The Fifth Circuit affirmed the dismissal of Geophysical's contributory infringement claim on

---

[1] Additional facts concerning the Canadian regulatory regime and the parties' actions are provided in the court's earlier Memorandum and Opinion, Docket Entry No. 28, at 2–6.

extraterritoriality grounds, but reversed the dismissal of the unauthorized-importation component of Geophysical's direct infringement claim. *Id.* at 799–800. The Fifth Circuit's direction on remand stated as follows:

> [T]he district court must first decide whose law governs the determination whether the copies imported by TGS were "lawfully made" under § 109. It must then apply the legal principles that it determines to govern. For example, if the district court finds that Canadian law controls the inquiry, then it may be helpful to await the input of the Canadian courts on Geophysical's challenge to the [Board's] practice of making and releasing copies of seismic lines. Alternatively, if the district court finds that United States law controls, then it may revisit its initial inclination that Geophysical granted the [Board] an implied license—though the creation of an implied license, which turns on the copyright holder's intent, is a fact question.

*Id.*[2]

Following the Fifth Circuit's remand, TGS filed a renewed motion to dismiss, Geophysical responded, and TGS replied. (Docket Entry Nos. 62, 72, 74). After the court heard oral argument, (Docket Entry No. 79), TGS filed a supplemental reply, Geophysical filed a supplemental response, and TGS filed a second supplemental reply. (Docket Entry Nos. 81, 84, 85).

Based on the complaint, (Docket Entry No. 1), the motion to dismiss, the parties' briefing and supplemental briefing, the oral argument, and the applicable law, the court denies TGS's renewed motion to dismiss and sets a scheduling and status hearing for **December 1, 2017** at **1:30 p.m.** The reasons for the ruling are explained below.

## II.    The Rule 12(b)(6) Legal Standard

---

[2] The remanded statutory interpretation question assumes that United States copyright law governs the underlying suit. Geophysical brought this action under the United States Copyright Act, 12 U.S.C. §§ 501 and 1202 and there is no dispute that United States law applies. The remanded choice-of-law question requires the court to decide which legal standard—American or Canadian—determines whether a copy was "lawfully made" under § 109 of the United States Copyright Act.

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a) (2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'" *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum

expenditure of time and money by the parties and the court." *Id.* (quoting *Twombly*, 550 U.S. at 558) (internal quotation marks and alteration omitted).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) (Rule 15(a) "evinces a bias in favor of granting leave to amend"); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). A court in its discretion may deny a motion to amend for futility if the amended complaint would fail to state a claim upon which relief could be granted. *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (citing *Stripling v. Jordan Productions Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000)). The decision to grant or deny leave to amend "is entrusted to the sound discretion of the district court." *Pervasive Software Inc. v. Lexware GmbH & Co.*, 688 F.3d 214, 232 (5th Cir. 2012).

In considering a Rule 12(b)(6) motion to dismiss, a court limits itself to the contents of the pleadings, with an exception. In *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss. The Fifth Circuit made it clear that "such consideration is limited to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins*, 224 F.3d at 498–99). Other courts approve the same practice. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987

F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." (citations omitted)); *see also Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988) (citation omitted); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

When "matters outside the pleadings" are submitted in support of or in opposition to a Rule 12(b)(6) motion to dismiss, Rule 12(b) grants courts discretion to accept and consider those materials, but does not require them to do so. *See Prager v. LaFaver*, 180 F.3d 1185, 1188–89 (10th Cir. 1999); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5C WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366). A court exercises this discretion by determining whether the proffered material, and the resulting conversion from the Rule 12(b)(6) to the Rule 56 procedure, is likely to facilitate disposing of the action. *Isquith*, 847 F.2d at 193 n.3. If the court decides to consider such extraneous material, then the court must treat the Rule 12(b)(6) motion as a motion for summary judgment under Rule 56. FED. R. CIV. P. 12(d). If the court refuses to consider those materials outside the pleadings, then the Rule 12(b)(6) motion remains intact and may be decided on its merits under the appropriate standard of review.

## III.    Interpreting "Lawfully Made Under This Title"

### A.    The Interpretation Issues

Under United States copyright law, a copyright owner has the exclusive right "to do and to authorize" certain actions involving a copyrighted work. 17 U.S.C. § 106. Those actions include "distribut[ing] copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." *Id.* at § 106(3). The copyright owner's exclusive right

to distribute encompasses the right to prohibit distribution of the copyrighted work, including importation into the United States, by others without the owner's permission. *Id.* at § 602(a)(1) ("Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106.").

The distribution right is exclusive, but it is not absolute. One limit is the first sale doctrine, which dates back to English common law. *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013) (citing 1 E. COKE, INSTITUTES OF THE LAWS OF ENGLAND § 360 (1628)). The doctrine was first recognized in the United States in a 1908 Supreme Court opinion holding that the copyright statutes did not grant a copyright owner the right to control all sales for the indefinite future. The Court stated:

> In our view the copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose, by notice, such as is disclosed in this case, a limitation at which the [work] shall be sold at retail by future purchasers, with whom there is no privity of contract. This conclusion is reached in view of the language of the statute, read in the light of its main purpose to secure the right of multiplying copies of the work,—a right which is the special creation of the statute. . . . To add to the right of exclusive sale the authority to control all future retail sales, by a notice that such sales must be made at a fixed sum, would give a right not included in the terms of the statute, and, in our view, extend its operation, by construction, beyond its meaning, when interpreted with a view to ascertaining the legislative intent in its enactment.

*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350–51 (1908).

The statute currently codifying the first sale doctrine provides: "Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord *lawfully made under this title*, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. §

109(a) (emphasis added). The doctrine "reflects the fundamental principle of copyright that ownership of the copyright in a work is distinct from ownership of the material object that embodies the work." *Geophysical*, 850 F.3d at 793. A copyright owner's distribution right ends when a "lawfully made" copy has been transferred to a third party.

The Fifth Circuit remanded this case "for determination of the proper standard by which to assess whether imported copies made abroad were lawfully made under § 109 and application of that standard." *Id.* at 796. That "proper standard" has long been elusive,[3] and the parties dispute what the phrase "lawfully made under this title" means. The approaches to interpreting the phrase are analyzed below.

## B. The Current Law

The Supreme Court has twice reviewed the interplay between § 602(a)'s importation restriction and § 109(a)'s first sale doctrine. In 1998, the Court addressed "whether the 'first sale' doctrine endorsed in § 109(a) is applicable to imported copies." *Quality King Distributors, Inc. v. L'anza Research Intern., Inc.*, 523 U.S. 135, 138 (1998). L'anza, a California corporation, sold hair products to domestic distributors who agreed to distribute the products to authorized vendors in limited locations. *Id.* L'anza also sold its products to foreign distributors at prices much cheaper

---

[3] The phrase has caused uncertainty for both judges and scholars. *See John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210, 220 (2d Cir. 2011), *rev'd and remanded*, 569 U.S. 519 (2013) (describing § 109(a) as an "utterly ambiguous text"); Robert A. Paul, *Black and White: A Path Toward Clarity for Copyright Law and Gray Market Goods*, 23 DEPAUL J. ART TECH. & INTELL. PROP. L. 155, 200 (2012); Patrick J. Coyne, *The First Sale Doctrine After* Costco*: Brilliantly Reconciling Decades of Legislative Revision; The Forgotten Curve of the Manufacturing Clause; or Just Plain Bad Statutory Drafting?*, 6 AKRON INTELL. PROP. J. 19 (2012); Alex N. Rosenblum, *Wiley's First Sale Folly: The Irrelevance of Location of Manufacture When Raising a First-Sale Defense*, 19 SW. J. INT'L L. 231 (2012); 2-8 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.13[B][3][c][v][I] (2017) ("A whole new layer of uncertainty now attends this entire body of law, requiring yet a fourth Supreme Court opinion to elaborate.").

than it charged the domestic distributors. *Id.* at 139. Products sold to foreign distributors made their way back into the United States and were sold to vendors without L'anza's authorization. *Id.* These vendors sold the products at cheaper prices than the authorized domestic distributors charged. *Id.* L'anza sued.

The Court held that § 602(a) "does not categorically prohibit the unauthorized importation of copyrighted materials," explaining that:

> [a]fter the first sale of a copyrighted item "lawfully made under this title," any subsequent purchaser, whether from a domestic or from a foreign reseller, is obviously an "owner" of that item. Read literally, § 109(a) unambiguously states that such an owner "is entitled, without the authority of the copyright owner, to sell" that item. Moreover, since § 602(a) merely provides that unauthorized importation is an infringement of an exclusive right "under section 106," and since that limited right does not encompass resales by lawful owners, the literal text of § 602(a) is simply inapplicable to both domestic and foreign owners of L'anza's products who decide to import them and resell them in the United States.

*Id.* at 144–45. Because the first sale doctrine limits § 106, and because importation under § 602(a) is a violation of § 106(3), the first sale doctrine also limits § 602(a). The defendants in *Quality King* were shielded from copyright infringement liability because they were the valid owners of "lawfully made" products. But the facts of *Quality King* made the holding narrow. The products at issue were manufactured in the United States, exported to foreign distributors, and imported back into the United States. The Court did not address situations "in which the allegedly infringing imports were manufactured abroad." *Id.* at 154 (Ginsburg, J., concurring).

Fifteen years later, in *Kirtsaeng v. John Wiley & Sons, Inc.*, the Supreme Court decided whether the selling of products manufactured outside the United States and imported into the

country were sales "lawfully made under this title" for purposes of the first sale doctrine.[4] 568 U.S. at 525. The respondent, John Wiley & Sons, was an academic textbook publisher that sold books in the United States. *Id.* at 525. John Wiley also authorized its wholly owned foreign subsidiary to publish, print, and sell "essentially equivalent versions" of the same textbooks in Asia. *Id.* at 525–26. Kirtsaeng, a citizen of Thailand studying in the United States, took advantage of the lower prices of the Asian textbooks by having family and friends buy copies of the textbooks in Thailand and mail them to Kirtsaeng in the United States, where he sold them for less than the United States distributors. *Id.* at 527. John Wiley sued, alleging that Kirtsaeng's unauthorized importation of its textbooks violated § 602's import prohibition. *Id.* Kirtsaeng argued that because the textbooks were "lawfully made" in Asia and he had lawfully obtained them in Asia, he could import and sell the books in the United States without John Wiley's permission. *Id.*

The question before the Supreme Court was "whether the words 'lawfully made under this title' restrict the scope of § 109(a)'s 'first sale' doctrine geographically." *Id.* John Wiley argued that there was a geographical limitation on the first sale doctrine, making it inapplicable to Kirtsaeng's importation of textbooks published abroad. The Court noted rulings made by the Second Circuit and the Ninth Circuit, and the argument of the Solicitor General, against the existence of a geographical limit.[5]

---

[4] In 2010, the Court released a per curiam decision without comment in *Costco Wholesale Corp. v. Omega*, 562 U.S. 40 (2010). The decision affirmed the Ninth Circuit's approach of interpreting "lawfully made under this title" as applying "only to copies legally made . . . in the United States." *Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982 (9th Cir. 2008). The Justices divided 4-4 because one Justice recused. *Omega*, 562 U.S. at 40. The Ninth Circuit's ruling was abrogated by *Kirtsaeng*.

[5] The Second Circuit had interpreted "lawfully made under this title" to mean "made in territories in which the Copyright Act is law," encompassing only copies manufactured domestically. *Kirtsaeng*, 654 F.3d at 222. The Ninth Circuit had held that the first sale doctrine applied to copies manufactured in the United States and copies created abroad but sold in the United States with the copyright owner's authority. *Denbicare U.S.A. Inc. v. Toys R Us, Inc.*, 84 F.3d 1143, 1149–50 (9th Cir. 1996). The Solicitor General

The Supreme Court declined to recognize a geographical limit on the first sale doctrine. Agreeing with Kirtsaeng, the Court held that "'lawfully made under this title' means 'in accordance with' or 'in compliance with' the Copyright Act." *Id.* at 530. The Court found that this interpretation gave meaning to each word of the five-word phrase: "The first two words of the phrase, 'lawfully made,' suggest an effort to distinguish those copies that were made lawfully from those that were not, and the last three words, 'under this title,' set forth the standard of 'lawful[ness].'" *Id.*

But *Kirtsaeng* did not provide an answer to the question here: what body of law applies to determine whether a copy was made lawfully in the first place? The Court did not need to reach this question in *Kirtsaeng* because the Asian textbooks were clearly lawfully published and sold in Asia. The parties agreed that the Asian textbooks were made with John Wiley's permission. *Id.* at 526. Read narrowly, "*Kirtsaeng* stands only for the proposition that permission from the a copyright owner to produce copies abroad extinguishes his or her rights to object to their later importation into the United States." 2-8 NIMMER ON COPYRIGHT § 8.13[B][3][c][v][I].

Geophysical and TGS dispute whether the copy of the seismic data that TGS requested and that the Canadian Board made and sent to TGS in the United States was lawfully made. The choice-of-law question left open in *Kirtsaeng* must be addressed.

## C. The Parties' Contentions

Geophysical argues that United States copyright law controls whether the copies TGS imported were "lawfully made." (Docket Entry No. 72, at 13). Geophysical's argument is based

---

argued that the doctrine applied only to copies made in the United States, "subject to" and "in compliance with" the Copyright Act. *Kirtsaeng*, 568 U.S. at 528–29.

on interpreting "under this title" to mean "under the Copyright Act," making that Act the "standard of lawfulness" regardless of where the work or copy was made. *Kirtsaeng*, 568 U.S. at 528–29 (quotation and alteration omitted). Under Geophysical's interpretation:

> [A] copy made anywhere in the world in a way that does not comply with U.S. law is not 'lawfully made' for purposes of the first sale doctrine. Where foreign law and U.S. law differ, to decide whether a copy was 'lawfully made,' a 'minute comparison must be undertaken to answer the question whether the conduct validated abroad would be lawful, assuming that Title 17 applied to that territory.'

(Docket Entry No. 72, at 14) (citing 2-8 NIMMER ON COPYRIGHT § 8.13[B][3][c][v][I], n.336). Under this interpretation, the court determines whether making the copy of the seismic data in Canada satisfied Title 17, assuming that it applied.

TGS argues that "lawfully made under this title" means a nonpirated work made under either Title 17 or under foreign law "similar to or consistent" with that domestic law. (Docket Entry No. 62, at 18). TGS points to *Kirtsaeng* to support its interpretation:

> *Kirtsaeng* provided guidance on how to construe the five words—"lawfully made under this title"—that are critical in this case. A copy is "lawfully made under this title" if it is either (1) made "in compliance with" the Copyright Act, or (2) made "in accordance with" the Copyright Act. To be in "accord" with something can mean "to be consistent or in harmony" with it. *See* Merriam-Webster Online Dictionary (2017); The American Heritage Dictionary of the English Language (5th ed. 2011) ("To be in agreement, unity, or harmony." . . . Applying that definition means, not that the Copyright Act must literally apply (because it has no extraterritorial reach), but that the foreign country's law must be similar to or consistent with U.S. copyright law.

(Docket Entry No. 62, at 17–18) (citation omitted). Under TGS's interpretation, if "under this title" refers to Title 17 and to similar foreign law, and if the "foreign copy does not constitute a pirated work," then "so long as it is lawfully made by the copy 'owner,' it is entitled to first-sale protection." *Id.* at 18. TGS contends that its interpretation makes linguistic sense, is "consistent

with the principle that the Copyright Act does not apply extraterritorially," and fulfills the legislative intent. *Id.* Under this interpretation, the court determines whether the copying of the seismic data in Canada satisfied Title 17 or a similar Canadian law.

### D. Other Interpretations

The parties' arguments are not the only interpretations of "lawfully made under this title." One other interpretation is the "look-to-local-copyright-law approach." Under this approach, "the question would be whether the manufacturer acting in [a foreign city] complied with the applicable law in [the foreign city's country], in order to fall within *Kirtsaeng*'s regime of international exhaustion." 2-8 NIMMER ON COPYRIGHT § 8.13[B][3][c][v][III]. This approach has been criticized, and with reason. First, it reads "under *this* title" out of the statute by making the lawfulness of a foreign copy controlled only by foreign law. Second, copies that are pirated under United States law could lawfully be imported into the United States as long as the copies were made in countries that did not prohibit them as pirated works. Copies made in countries without any copyright laws would be "lawfully made," even if the copies were clearly pirated under American law. *Kirtsaeng* does not permit this result. 568 U.S. at 535 ("Section 109(a) now makes clear that a lessee of a copy will not receive 'first sale' protection but one who owns a copy will receive 'first sale' protection, provided, of course, that the copy was 'lawfully made' *and not pirated*." (emphasis added)). The "look-to-local-copyright-law approach" does not work.

Another interpretation is the "hyper-literal approach." This approach assumes that "one could interpret copies to be made 'lawfully under this title' to the extent that they do not fall directly afoul of U.S. Copyright law." 2-8 NIMMER ON COPYRIGHT § 8.13[B][3][c][v][I]. This approach has also been criticized, again with reason. Copies unlawfully made by United States standards—or

even by the standards of the country in which the copies were created—would enjoy protection under § 109(a) so long as no part of Title 17 explicitly prohibited the copying. This interpretation could, as under the "look-to-local-copyright-law approach," make clearly pirated copies saleable without restriction. *Kirtsaeng* is inconsistent with this approach as well.

## IV.    Analyzing the Interpretations

### A.    The Law that Provides the Legal Standard

"As with all issues of statutory interpretation, the appropriate place to begin is with the text itself." *Legacy Cmty. Health Servs., Inc. v. Janek*, 184 F. Supp. 3d 407, 423 (S.D. Tex. 2016). The Fifth Circuit noted that the words "this title," in the phrase "lawfully made under this title," "presumably refer[] to the title in which it appears, the Copyright Act." *Geophysical Service, Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 795–96 (5th Cir. 2017). In *Kirtsaeng*, the Supreme Court held that "'lawfully made under this title' means 'in accordance with' or 'in compliance with' the Copyright Act." *Kirtsaeng*, 568 U.S. at 530. Relying on *Kirtsaeng*, TGS argues that "[a]pplying that definition means, not that the Copyright Act must literally apply (because it has no extraterritorial reach), but that the foreign country's law must be similar to or consistent with U.S. copyright law." (Docket Entry No. 62, at 18). TGS's argument rests on interpreting "in accordance with" to mean "consistent or in harmony with." *Id.* at 17–18 (quotation omitted). Under TGS's reading, creating a work or copy in compliance with a foreign copyright law that is "similar" to the United States Copyright Act makes the work or copy "lawfully made." TGS's interpretation assumes that "this title" in § 109(a) refers to Title 17, but that *Kirtsaeng*'s gloss on the statutory language expands "this title" to foreign copyright laws in certain circumstances.

An example shows why TGS's broad interpretation is problematic.  Consider two copyright laws, 17 U.S.C. § 302(a) and a foreign equivalent.  Section 302(a) states that the "[c]opyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death."  Assume that the foreign county's copyright law provided that the "copyright in a work created on or after January 1, 1977, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 68 years after the author's death."

The foreign country's copyright law is "similar" in some way to § 302(a).  Both the foreign law and § 302(a) define the period before a work enters the public domain.  But the foreign law's date of application is one year earlier and the copyright term is two years shorter than under the United States law.  They are inconsistent to this extent.

Under TGS's interpretation, the foreign law would "not offend the principles and objectives of the U.S. Copyright Act," making any copies lawfully created under the foreign law to be "in accord with U.S. law and thus [] 'lawfully made under this title.'"  (Docket Entry No. 47, at 4).  Under the TGS approach, a copy of a work created on January 1, 1979 in the foreign country 69 years after the author's death, without any other authorization, would be "lawfully made" even though § 302(a) of Title 17 provides for a 70-year post-death copyright term.  TGS's interpretation does not take into account foreign laws that permit copies that would be unlawful if made under United States copyright law.

Geophysical's interpretation does this.  Geophysical's interpretation asks a court to assume that Title 17 applies abroad and ask whether the foreign-made copy would have violated Title 17,

even if this means engaging in a "minute comparison . . . to answer the question whether the conduct validated abroad would be lawful . . . ." 2-8 NIMMER ON COPYRIGHT § 8.13[B][3][c][v][I], n.336. Under Geophysical's interpretation, a copy of a work created on January 1, 1979 in the foreign country 69 years after the author's death, without any other authorization, would not be "lawfully made" because § 302(a) of Title 17 provides for a 70-year post-death copyright term. But if the copy of the 1979 work was made in the foreign country 71 years after the author's death, it would be "lawfully made" under Title 17, even though the foreign law is not identical to § 302(a). Geophysical's interpretation is consistent with *Kirtsaeng*'s language. Creation of a work "in compliance with" Title 17, under Title 17 itself or under an identical foreign law, is "lawfully made." Creation of a work "in accordance with" Title 17, under a foreign law in a manner that would not violate Title 17 if Title 17 applied, is "lawfully made."

Both the Fifth Circuit and TGS acknowledge the difficulties that this application of United States copyright law to foreign-made copies creates. *Geophysical*, 850 F.3d at 796 ("But applying United States law seems to foul the principle that the Copyright Act has no extraterritorial application, and creates some conceptual awkwardness where, like here, the foreign-made copies were made pursuant to some legal regime that finds no analog in United States law."); *see also* Docket Entry No. 62, at 5. Justice Kagan's concurrence in *Kirstaeng* sheds some light on the extraterritoriality question. The concurrence noted that the Court:

> interpret[ed] § 109(a) as applying only to copies whose making actually complied with Title 17, or would have complied with Title 17 had Title 17 been applicable (i.e., had the copies been made in the United States). . . . Congress, however, used express language when it called for such a counterfactual inquiry in 17 U.S.C. §§ 602(a)(2) and (b). *See* § 602(a)(2) ("Importation into the United States or exportation from the United States, without the authority of the owner of copyright under this title, of copies or phonorecords, the making of which either constituted an

infringement of copyright, or *which would have constituted an infringement of copyright if this title had been applicable*, is an infringement of the exclusive right to distribute copies or phonorecords under section 106." (emphasis added)); § 602(b) ("In a case where the making of the copies or phonorecords *would have constituted an infringement of copyright if this title had been applicable*, their importation is prohibited." (emphasis added)). Had Congress intended courts to engage in a similarly hypothetical inquiry under § 109(a), Congress would presumably have included similar language in that section.

568 U.S. at 563–64 (Kagan, J., concurring) (emphasis in original).

Justice Kagan's concurrence confirms that the *Kirtsaeng* majority's interpretation should be read as effectively applying § 109 extraterritorially. *See id.* at 530 (majority op.) (interpreting "§ 109's 'first sale' doctrine . . . [to] apply to copyrighted works as long as their manufacture [meets] the requirements of American copyright law"). The *Kirtsaeng* majority emphasized that while Title 17 "does not instantly *protect* an American copyright holder from unauthorized piracy taking place abroad . . . [it] does not mean the Act is *inapplicable* to copies made abroad." 568 U.S. at 531 (emphasis in original); *see also* 3-17 NIMMER ON COPYRIGHT § 17.02 ("[C]opyright laws do not have any extraterritorial operation. . . . This principle, however, requires some qualification."). As the majority explained, Title 17 "'applies' to an Irish manuscript laying in its author's Dublin desk drawer as well as to an original recording of a ballet performance first made in Japan and now on display in a Kyoto art gallery." *Id.* at 532. Justice Kagan's concurrence also refers to statutes that show Congress's willingness to apply Title 17 extraterritorially. *See* 17 U.S.C. §§ 602(a)(2)–(b).

Despite curtailing Title 17's no-extraterritorial-application principle and creating "conceptual awkwardness," Geophysical's interpretation of § 109 is consistent with *Kirtsaeng* and avoids the more serious problems of the alternative interpretations that run counter to Title 17's language.

On remand, the court interprets "lawfully made under this title" to mean that a copy is lawful if it was made in the United States in compliance with Title 17 or in a foreign country in a manner that would comply with Title 17 if United States copyright law applied.

## B.     Applying the Legal Standard

TGS asserts that the seismic data copies were "lawfully made" by the Canadian Board because they would have been authorized by United States law had they been made in the United States.[6] TGS argues that "the Court must pretend that the copies had been made in the United States and determine whether the making of those copies would have violated the Copyright Act." (Docket Entry No. 74, at 14). The court does not need to "pretend" that the copies were made in the United States subject to all United States laws, but instead must determine whether the copies, made abroad, were made in a manner that would have violated Title 17 if it applied. The United States regulatory regime that governed the submission and disclosure of processed seismic data is not part of Title 17. A foreign copy is not "lawfully made under this title" if it would have been lawful under United States laws or regulations besides Title 17. The issue is whether the Board's copying and importation at TGS's request was lawfully made under Title 17, not under another foreign statute, law, or regulation that may have a United States equivalent. 17 U.S.C. § 602(a)(1).

In 1982 as well as in 1999, both Canadian and United States law required parties conducting seismic surveys to submit the data to the government, knowing that it could be disseminated at a later date. But the Canadian and United States regulatory regimes do not affect the copyright status of foreign-made copies of the seismic data obtained from surveying in the foreign country. Canada's

---

[6] TGS submitted a supplemental brief with a detailed timeline of the progression of the respective United States and Canadian regulatory regimes on the submission and disclosure of processed seismic data. (Docket Entry No. 81). Geophysical does not contest the accuracy of TGS's timeline with respect to the United States regime. (Docket Entry No. 84, at 13).

licensing does not expand or restrict the rights confirmed by Title 17. *See* 17 U.S.C. 201(e) (when copyright ownership "has not previously been transferred voluntarily . . . no action by any governmental body . . . shall be given effect"); *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 803 (5th Cir. 2002) ("Section 201(e) of the Act reflects Congress's intention to protect copyrights from involuntary appropriation by government entities."). If the Canadian Board's copying and importation at TGS's request is unlawful under Title 17, the fact that it satisfied the Canadian or American seismic survey licensing regulations does not mean that the copies were "lawfully made under this title." If the Canadian Board's copying and importation were lawful under Title 17, they are lawful "under this title" without regard to whether they complied with or violated the Canadian or the United States regulations on submitted seismic survey data.

The similarities between the United States and Canadian regulatory regimes on seismic survey data do not establish that, as a matter of law, the seismic copies were "lawfully made" under Title 17 because they complied with Canadian licensing regulations on seismic survey data. Dismissal of Geophysical's complaint for this reason is not warranted. Applying § 109's "lawfully made under this title" standard to this case, the creation of the seismic data copies in Canada would not have been authorized under Title 17. TGS's motion to dismiss on ground that the copies were "lawfully made under this title" is denied.

## V. Alternative Grounds for Dismissal

TGS makes two alternative arguments for lawful copying and importation, even if United States copyright law applies. TGS argues that the copies are protected by fair use and that Geophysical granted the Canadian Board an implied license to copy and distribute the seismic data. Each argument is addressed below.

## A.      Fair Use

Like the first sale doctrine, the fair-use doctrine can be traced back to English common law. The "fair abridgment" doctrine "treated the question of whether a use was bona fide as a complex factual question that resists bright-line rules and requires case-by-case analysis." Matthew Sag, *The Prehistory of Fair Use*, 76 BROOK. L. REV. 1, 23 (2011).  Justice Story introduced the doctrine to United States common law in *Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841).[7]  In *Folsom*, Justice Story noted that "a reviewer may fairly cite largely from [an] original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism."  *Folsom* identified factors to consider in deciding that question, including: "the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the object, of the original work."  *Folsom*, 9 F. Cas. at 344, 348.

In 1976, Congress codified the common law fair-use doctrine at 17 U.S.C. § 107, which states:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include–
>
> > (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> >
> > (2) the nature of the copyrighted work;

---

[7] *See* Gideon Parchomovsky & Philip J. Weiser, *Beyond Fair Use*, 96 CORNELL L. REV. 91, 99 (2010).

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

Section 107's list of factors is not exclusive. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 476 (1984). Instead, § 107 "is best understood as an endorsement of the essential fact-specificity and case-by-case methodology of the common law of fair use." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 595 n.19 (1985).

TGS correctly argues that fair use can be a ground for dismissal at the Rule 12(b)(6) stage. (Docket Entry No. 74, at 23); *see Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 692 (7th Cir. 2012); *Galvin v. Illinois Republican Party*, 130 F. Supp. 3d 1187, 1192 (N.D. Ill. 2015); *Payne v. Courier-Journal*, 2005 WL 1287434, at *3 (W.D. Ky. May 31, 2005); WILLIAM F. PATRY, PATRY ON FAIR USE § 7:5 (2017) ("Increasingly, courts have considered fair use on a rule 12(b)(6) motion to dismiss for failure to state a claim . . . ."). But the bar for this result is set high, requiring "facts sufficient to evaluate each of the statutory factors." *Harper*, 471 U.S. at 450. This requirement is particularly difficult to meet before any discovery. *See Brownmark*, 682 F.3d at 690 ("[C]ourts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses."); *Browne v. McCain*, 612 F. Supp. 2d 1125, 1130 (C.D. Cal. 2009) ("[I]n light of a court's narrow inquiry at this stage and limited access to all potentially relevant and material facts needed to undertake the analysis, courts rarely analyze fair use on a 12(b)(6) motion."); *Nichols v. Club for Growth Action*, 235 F. Supp. 3d 289, 295 (D.D.C. 2017).

Viewing the factual allegations in the light most favorable to Geophysical leads to the conclusion that it is premature to dismiss the complaint on fair-use grounds. This case is not like *Brownmark*, in which "only two pieces of evidence [were] needed to decide the question of fair use" at the motion to dismiss stage and made it clear that one work parodied the other. 682 F.3d at 690, 693. Nor is this case like *Payne*, in which "the Article and the work which it allegedly infringed [were] in the record," allowing a legal determination of infringement on a motion to dismiss. 2005 WL 1287434, at *3. Reviewing the four fair-use factors shows that more facts are needed to make a thorough and accurate fair-use determination.

The first factor, the purpose and character of the use, cannot be weighed without knowing more about how TGS used the Geophysical seismic data it obtained from the Canadian Board. TGS argues that this factor weighs in favor of finding fair use because it used the data to benefit the public. (Docket Entry No. 62, at 29–31; Docket Entry No. 74, at 24). But the "central purpose" of this factor is to see "whether the new work merely 'supersede[s] the objects' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . . ." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal citations omitted). Geophysical alleged that TGS "copied and distributed [its works], or made derivative works from [its works]." (Docket Entry No. 1, ¶ 10). Though Geophysical has abandoned its direct-infringement claims to the extent that they were based on TGS's actions after it received the copies, *Geophysical*, 850 F.3d at 792, the fair-use inquiry requires more facts to determine whether or how TGS's use altered the seismic data it received.

The second factor, the nature of the work, cannot be weighed without information on how the seismic data was made, processed, and compiled. The seismic data is not in the record.

Geophysical alleged in its complaint that collecting the seismic lines required "know-how, experience, judgment and utilizes proprietary techniques and equipment," and that the data must be specially processed in order to be utilized by a customer involved in exploring for oil and gas. (Docket Entry No. 1, ¶¶ 7–9). Perhaps the nature of Geophysical's works is more "'informational' or 'factual' than it is 'creative,'" as TGS argues. (Docket Entry No. 62, at 31); *Cariou v. Prince*, 714 F.3d 694, 709 (2d Cir. 2013) ("greater leeway" is afforded to the fair use work that is informational or factual). But even assuming that is true, Geophysical's decisions on how to arrange and assemble the seismic data go to the weight given to this factor. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 111 S. Ct. 1282, 1289 (1991) (a compilation's author can express degrees of creativity depending on how the author "chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers"). This factor, like the other fair-use factors, is not an "exclusive determinant[] of the fair use inquiry and [does] not mechanistically resolve fair use issues." *Harper*, 471 U.S. at 588. Additional discovery is needed to determine the weight to give this factor and which party it favors.

On the third factor, the amount and substantiality of the copied portion used, TGS states that "complete copying of the lines was necessary to achieve the purpose of the intended subsequent use: offshore exploration and development." (Docket Entry No. 62, at 32; Docket Entry No. 72, at 25). This admission makes this third fair-use factor weigh in Geophysical's favor. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) ("While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use."). TGS relies on its purpose-and-character-of-the-use argument to justify the extent of its copying, but, for the reasons stated above, applying this factor requires further discovery.

The fourth factor, the effect on the potential market, cannot be weighed without discovery into whether there was an implied license. TGS argues that "under the Canadian regulatory regime, there is no market for Geophysical's works after the confidentiality period." (Docket Entry No. 74, at 25). TGS is right if Geophysical granted the Board an implied license to disclose and distribute its data. But, for the reasons explained in detail below, whether Geophysical granted an implied license cannot be determined on the present record. More discovery is necessary to answer that question. If Geophysical did not grant the Board an implied license, discovery on the "actual harm to the market for the original" and "whether widespread use of the work . . . would impair the potential market for the original work and any derivative works" is necessary to determine the weight to be given this factor. *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 410 (5th Cir. 2004).

At this motion-to-dismiss stage, the record is not sufficient for the fact-intensive fair-use analysis. The identified areas of discovery are not exhaustive. The parties should focus on gathering facts not only on the four § 107 factors, but on any factors relevant to fair use. On the present record, TGS's motion to dismiss on the fair-use ground must be denied.

## B. An Implied License

TGS argues that Geophysical granted the Canadian Board an implied license to copy and distribute the seismic data Canadian law required Geophysical to submit.[8] (Docket Entry No. 62,

_____

[8] Geophysical argues that the Fifth Circuit's remand and mandate bars this court from ruling on this issue. *See Tollett v. City of Kemah*, 285 F.3d 357, 364 (5th Cir. 2002) ("[A] lower court on remand must implement both the letter and spirit of the [appellate court's] mandate, and may not disregard the explicit directives of that court." (emphasis omitted)). Geophysical's argument is unpersuasive. The Fifth Circuit ordered "further proceedings on [the direct infringement claim] in light of the principles discussed here." *Geophysical*, 850 F.3d at 800. The Court also suggested that the court "may revisit its initial inclination that Geophysical granted the [Board] an implied license," noting that the creation of an implied license is a fact question. *Id.* at 798. Nothing in the Fifth Circuit's order prohibits the court from ruling on TGS's implied

at 24; Docket Entry No. 27, at 20). If Geophysical gave the Board an implied license to distribute the seismic data Geophysical submitted as a condition to conducting the seismic survey, the infringement claim against TGS fails as a matter of law.

An implied license typically arises when: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 879 (5th Cir. 1997). "The critical element for finding an implied license is intent." *Sanchez v. Hacienda Records and Recording Studio, Inc.*, 2013 WL 529950, at *6 (S.D. Tex Feb. 11, 2013). "Without intent [to permit the use], there can be no implied license." *Id.* (quotation and citation omitted). An implied license can arise even when each of the *Lulirama* factors are not present but "where the totality of the parties' conduct supported such an outcome." *See Baisden v. I'm Ready Productions*, 693 F.3d 491, 501 (2012).

TGS argues that Geophysical's complaint allegations establish an intent to convey an implied license because Geophysical was aware of and complied with Canada's licensing requirement to submit the seismic data and agree to a limited confidentiality period. TGS asserts that the Canadian regulatory regime has, at the relevant times, provided that the submitted data would be disclosed on request after a period of confidentiality, and that Geophysical voluntarily submitted its seismic data to the Board knowing that it could be disclosed when this period expired.

TGS is correct that the complaint alleges Geophysical's participation in this regulatory licensing scheme. Geophysical alleges that it "was required to, and did, submit to the [Board] a

license argument.

copy of [its works]." (Docket Entry No. 1, ¶ 29). But the parties dispute whether this amounted to an implied license and, if so, the parameters of the license that resulted. These disputes cannot be resolved on the present record.

One dispute is whether Geophysical intended to grant the Board an implied license that extended to copying and distribution. Geophysical alleges that the Board "was never authorized to copy or distribute [Geophysical's works], or make derivative works from [its works]." *Id.* at ¶ 30. As this court previously noted, "[n]either the Act nor the Regulations contain language limiting the Petroleum Board's authority to copy and distribute the seismic line and other data it requires surveyors to submit." (Docket Entry No. 28, at 15). Instead, the Canadian regulations use broad language that gives the Board "extensive control over the data, including the right to copy and distribute it after the confidentiality period ends." *Id.* But even assuming that the Board had the authority to copy and distribute the seismic data it required, the question of Geophysical's intent turns on the information and circumstances available to it at the relevant time. Would a company in Geophysical's position in 1982 and 1983 reasonably understand that the Canadian regulations permitting the Board to disclose the seismic data after the confidentiality period ended could result in the copying and distribution of that data to any requesting party? Did the Board have discretion to decide whether to copy and send the data to those requesting it, as Geophysical argues? (Docket Entry No. 72, at 25; Docket Entry No. 84, at 4). If so, does the Board's discretion affect whether Geophysical intended to grant an implied license that included copying and distribution? And if Geophysical granted an implied license, should Geophysical have reasonably expected the license to extend to importation of copies of its works into the United States?

These questions—and there may be more—cannot be answered on the present record. The questions are important to determine whether Geophysical's participation in the Canadian regulatory regime shows that it granted the Board an implied license to copy and distribute its seismic data and import it into the United States. *See Geophysical*, 850 F.3d at 799 (the creation of an implied license is a fact question). On the present record, TGS's motion to dismiss on the implied-license ground must be denied.

## IV.     Conclusion

TGS's motion to dismiss is denied on the present record. (Docket Entry No. 62). A status and scheduling conference is set for **December 1, 2017**, at **1:30 p.m.**

SIGNED on November 21, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge