**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| GEOPHYSICAL SERVICES, INCORPORATED, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 14-1368 |
| TGS-NOPEC GEOPHYSICAL SERVICES, | § § § | |
| Defendant. | § § | |

**MEMORANDUM AND OPINION**

The plaintiff, Geophysical Services Incorporated, brought this copyright suit against the defendant, TGS-NOPEC Geophysical Services. (Docket Entry No. 1). TGS moved for summary judgment, Geophysical responded, and TGS replied. (Docket Entry Nos. 96, 98, 99). The parties appeared at a hearing on July 15, 2018 and presented oral argument on their positions.

Based on the law, the record, and the parties' arguments, the summary judgment motion is granted. Final judgment is entered separately. The reasons for this ruling are explained below.

## I.    Background

Geophysical Services Incorporated is a Canadian company that collects seismic data by bouncing sound waves off the ocean floor, recording the information and processing, transcribing, and storing the information as seismic lines.[1] Geophysical licenses the seismic data to oil and gas companies for use in oil, gas, and other hydrocarbon exploration. Geophysical asserts a copyright interest in the seismic data under United States law.

---

[1] Additional background facts are provided in the court's earlier Memorandum and Opinion (Docket Entry No. 86 at 1–3).

In 1999, TGS, a Houston company, requested copies of seismic data that Geophysical had submitted to a Canadian agency in 1982 and 1983, the Canada Oil and Gas Lands Administration, pursuant to Canadian laws and regulations. The Administration's successor, the Canada-Newfoundland and Labrador Offshore Petroleum Board, made copies and sent them to TGS at its Houston address. TGS performed seismic surveys at several of the same locations Geophysical had surveyed in 1982. TGS licensed the seismic data it collected to oil and gas companies. Geophysical discovered TGS's actions in 2013 and sued in May 2014.

## II.     Procedural History

### A.     The First Motion to Dismiss

Geophysical's original complaint alleged that TGS directly and contributorily infringed Geophysical's copyrights in the 1982 seismic data by requesting copies from the Board, making the copies it received from the Board available to third parties, creating derivative works by surveying the locations disclosed in the Geophysical seismic lines to collect its own seismic data, which it licensed to third parties, and licensing and distributing copies of these derivative works without including Geophysical's copyright-management information. (Docket Entry No. 1).

TGS moved to dismiss, arguing that Geophysical's complaint failed to state a claim and that any claim was barred by the act-of-state doctrine and by international comity. (Docket Entry No. 10). After briefing and argument, the court granted TGS's motion to dismiss. (Docket Entry No. 28). The court vacated its dismissal because the opinion relied on grounds that the parties had not expressly raised. (Docket Entry No. 43). The court issued an amended memorandum and opinion and order that again dismissed Geophysical's complaint. *Id.*

### B.     The Interlocutory Appeal

Geophysical filed an interlocutory appeal challenging the dismissals of the unauthorized-importation basis of its direct infringement claim and the dismissal of the contributory infringement claim. *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 792 (5th Cir. 2017). The Fifth Circuit affirmed the dismissal of Geophysical's contributory infringement claim on extraterritoriality grounds, but reversed the dismissal of the unauthorized-importation component of Geophysical's direct infringement claim. *Id.* at 799–800. The Fifth Circuit directed this court to decide on remand which law governs the determination of whether the copies TGS imported were "lawfully made" under 17 U.S.C. § 109, and then to apply that law to the record in this case. *Id.*

### C.     The Second Motion to Dismiss

Following the Fifth Circuit's remand, TGS filed a renewed motion to dismiss, Geophysical responded, and TGS replied. (Docket Entry Nos. 62, 72, 74). After the court heard oral argument, (Docket Entry No. 79), TGS filed a supplemental reply, Geophysical filed a supplemental response, and TGS filed a second supplemental reply. (Docket Entry Nos. 81, 84, 85).

On November 21, 201, this court issued a memorandum and order denying TGS's motion to dismiss. (Docket Entry No. 86). First, this court found that a copy is "lawfully made under this title" if the copy is lawfully made in the United States in compliance with Title 17, or in a foreign country in a manner that would comply with Title 17 if United States copyright law applied. *Id.* at 17; 17 U.S.C. § 602(a)(1). This court declined to dismiss on the basis of an implied license, because the record was insufficient to find a license as a matter of law. *Id.* at 26. The court stated:

> TGS argues that Geophysical's complaint allegations establish an intent to convey an implied license because Geophysical was aware of and complied with Canada's licensing requirement to submit the seismic data and agree to a limited confidentiality period. TGS asserts that the Canadian regulatory regime has, at the relevant times, provided that the submitted data would be disclosed on request after a period of confidentiality, and that Geophysical voluntarily submitted its seismic data to the Board knowing that it could be disclosed when this period expired.

TGS is correct that the complaint alleges Geophysical's participation in this regulatory licensing scheme. Geophysical alleges that it "was required to, and did, submit to the [Board] a copy of [its works]." (Docket Entry No. 1, ¶ 29). But the parties dispute whether this amounted to an implied license and, if so, the parameters of the license that resulted. These disputes cannot be resolved on the present record.

One dispute is whether Geophysical intended to grant the Board an implied license that extended to copying and distribution. Geophysical alleges that the Board "was never authorized to copy or distribute [Geophysical's works], or make derivative works from [its works]." *Id.* at ¶ 30. As this court previously noted, "[n]either the Act nor the Regulations contain language limiting the Petroleum Board's authority to copy and distribute the seismic line and other data it requires surveyors to submit." (Docket Entry No. 28, at 15). Instead, the Canadian regulations use broad language that gives the Board "extensive control over the data, including the right to copy and distribute it after the confidentiality period ends." *Id.* But even assuming that the Board had the authority to copy and distribute the seismic data it required, the question of Geophysical's intent turns on the information and circumstances available to it at the relevant time. Would a company in Geophysical's position in 1982 and 1983 reasonably understand that the Canadian regulations permitting the Board to disclose the seismic data after the confidentiality period ended could result in the copying and distribution of that data to any requesting party? Did the Board have discretion to decide whether to copy and send the data to those requesting it, as Geophysical argues? (Docket Entry No. 72, at 25; Docket Entry No. 84, at 4). If so, does the Board's discretion affect whether Geophysical intended to grant an implied license that included copying and distribution? And if Geophysical granted an implied license, should Geophysical have reasonably expected the license to extend to importation of copies of its works into the United States?

These questions—and there may be more—cannot be answered on the present record. The questions are important to determine whether Geophysical's participation in the Canadian regulatory regime shows that it granted the Board an implied license to copy and distribute its seismic data and import it into the United States. *See Geophysical*, 850 F.3d at 799 (the creation of an implied license is a fact question). On the present record, TGS's motion to dismiss on the implied-license ground must be denied.

*Id.* at 25-27.

On December 1, the parties were given a deadline to complete discovery limited to the implied-license issue. (Docket Entry Nos. 88, 89). After, TGS moved for summary judgment, Geophysical responded, and TGS replied. (Docket Entry Nos. 96, 98, 99).

### III. Timeline of Important Events

The following timeline describes the Canadian regulatory regime and the actions of Geophysical and its predecessors as to the seismic data at issue under that regime:

- 1953: The Territorial Regulations of 1953 establishes a Canadian regime governing the submission and disclosure of geophysical data. (Docket Entry No. 81 at 3); *Geophysical Serv., Inc. v. Encana Corp. et al.*, 2016 ABQB 230, ¶ 145 (Ct. Queen's Bench of Alberta 2016).

- 1960: The Canada Oil and Gas Regulations are enacted under the Territorial Lands Act and the Public Lands Grants Act. (Docket Entry No. 81 at 3); RSC 1952, c. 363; RSC 1952, c. 224. The regulations require offshore seismic surveyors to obtain government permission before beginning seismic surveying operations and to submit the resulting seismic data to the government. SOR 60-182, §§ 5(1), 29 (1960). The regulations provided for the "release" of the data after a one-year confidentiality period. SOR 60-182, § 108.

- 1961: The Canada Oil and Gas Land Regulations are amended to clarify the contents of the report that was required to be submitted by geophysical companies and to lengthen the confidentiality period. (Docket Entry No. 81 at 5); SOR 61-253, §§ 28, 54(2), 54(4)(a)-(c), 107(5)(a)(i) (1961).

- 1978: The Canada Oil and Gas Land Regulations are amended again, but no substantive changes are made. (Docket Entry No. 81 at 7); CRC 1518 (1978).

- April 1979: The Department of Energy, Mines and Resources' Resource Management Branch released the eighth issue of "Offshore Exploration," which contains information and procedures for offshore operators. (Docket Entry No. 96, Ex. 7). *Offshore Exploration* provides for the release of "[r]eports of geological and geophysical surveys," including "seismic sections and maps." *Id.* at 61-62. "Copies" of "seismic sections and maps may be purchased after expiry of the confidential period." *Id.* at 62.

- December 1981: The Canadian Parliament passed the Canada Oil and Gas Act, to become effective in March 1982. (Docket Entry No. 81 at 8); Canada Oil and Gas Act, SC 1980-81-82-83 (1982). Under the Oil and Gas Act, the 1978 Oil and Gas Regulations remained in effect to the extent they were consistent with the Oil and Gas Act. (Docket Entry No. 81 at 8); Canada Oil and Gas Act, SC 1980-81-82-83, c. 81, § 62 (1982). "The Oil and Gas Act did not contain a data submission requirement," but it does include a disclosure provision. (Docket Entry No. 81 at 8); Canada Oil and Gas Act, SC 1980-81-82-83, c. 81, § 50 (1982).

- January 1982: The Canada Oil and Gas Lands Administration was established, succeeding the Department of Energy, Mines and Resources and the Department of Indian and Northern Affairs Canada. (Docket Entry No. 96, Ex. 3 at ¶¶ 6-7). The Administration's Land Management Branch was "responsible for the negotiation, execution, and administration of exploration and production rights on all federal offshore and Northern lands." *Id.* at ¶ 6. The Administration's Resource Evaluation Branch was responsible for "the regulatory regime governing the submission and disclosure of technical data such as seismic lines." *Id.* at ¶ 7.

- March 24, 1982: Delaware GSI submitted a permit application seeking permission to conduct the survey that resulted in the creation of the seismic data at issue. (Docket Entry No. 96, Ex. 12). The application contained an Offshore Program Notice signed by a Delaware GSI official, but not yet approved by the Administration. *Id.* The notice states: "The requirements and services of the Federal agencies concerned are outlined in the publication "Offshore Exploration." *Id.*

- May 4, 1982: The Administration approved Delaware GSI's permit application. (Docket Entry No. 96, Ex. 6). The returned Offshore Program Notice contains the same reference to "Offshore Exploration." *Id.*

- November 1982: The Administration issued "Geophysical Surveys on Canada Lands: Guidelines for Approvals and Reports." (Docket Entry No. 96, Ex. 8). The "Guidelines for Approvals and Reports" expressly refer to "Offshore Exploration" as a "recommended reference publication" that "outline[d] the responsibilities and requirements of federal departments and agencies concerned with the offshore," and provided the list of "released geophysical/geological reports to April 1979." *Id.* at ¶ 1.

- November 26, 1982: According to Geophysical's records, the first submission of the seismic data at issue is made to the Administration. (Docket Entry No. 96, Ex. 11 at 4, Ex. 14).

- January 1983: The Administration issued "Released Geophysical and Geological Reports—Canada Lands," pre-dating at least four submissions of the seismic data. (Docket Entry No. 96, Ex. 11 at 4, Ex. 15). The "Reports" confirmed that released seismic lines would be "reproduce[ed]" and "duplicat[ed]" by a commercial firm, and identified 698 speculative and non-speculative geophysical programs that had already been released for reproduction and duplication. (Docket Entry No. 96, Ex. 15 at 5).

- March 8, 1983: Geophysical submitted prints of the seismic data at issue. (Docket Entry No. 96, Ex. 11 at 4, Ex. 16).

- March 21, 1983: Geophysical submitted prints of all Newfoundland data it shot and processed in 1982. (Docket Entry No. 96, Ex. 11 at 4, Ex. 17).

- April 6, 1983: Geophysical submits additional prints of the seismic data at issue. (Docket Entry No. 96, Ex. 11 at 4, Ex. 18).

- November 3, 1983: Geophysical submits additional prints of the seismic data at issue. (Docket Entry No. 96, Ex. 11 at 4, Ex. 18).

- March 25, 1987: The Canada-Newfoundland Atlantic Accord Implement Act states that any licenses granted to the Administration transfer to the Canada-Newfoundland and Labrador Offshore Petroleum Board by operation of law. Canada-Newfoundland Atlantic Accord Implementation Act, S.C. 1987, c. 3 at § 205.

- November 8, 1987: The seismic data at issue loses its confidentiality status. (Docket Entry No. 96, Ex. 9 at 8-9, Ex. 11 at 3, Ex. 15 at 1).

- April 1999: TGS receives copies of the seismic data. (Docket Entry No. 1 at ¶ 35).

This timeline provides the framework for deciding the summary judgment motion.

## IV. The Legal Standards

### A. Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material

fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing an absence of evidence to support the nonmoving party's case. *Fret v. Melton Truck Lines, Inc.*, 706 F. App'x 824, 827–28 (5th Cir. 2017). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014) (citing *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 F. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Parish Prison*, 663 F. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court

draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

### B. Express and Implied Licenses

A copyright owner may authorize the use of a copyrighted work by granting a license. "Generally, a 'copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement' and can sue only for breach of contract." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) (quoting *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)). "While the Copyright Act requires that exclusive licenses be evidenced by a writing, no such writing requirement applies to nonexclusive licenses." *Lulirama Ltd., Inc. v. Axcess Broadcast Sys., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997). A nonexclusive implied license may be implied from conduct or granted orally. *Carson v. Dynegy*, 344 F.3d 446, 451 n. 5 (5th Cir. 2003).

"Principles of contract law are generally applicable in the construction of copyright assignments, licenses and other transfers of rights." *Key Maps, Inc. v. Pruitt*, 470 F. Supp. 33, 38 (S.D. Tex. 1978). To form a binding express contract there must be: "(1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Malone v. Ariba, Inc.*, 99 F. App'x 545, 549 (5th Cir. 2004) (quoting *Komet v. Graves*, 40 S.W.3d 596, 600 (Tex. App. 2001)).

An implied license typically arises when: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 879 (5th Cir. 1997). "[T]he

creation of an implied license, which turns on the copyright holder's intent, is a fact question."

*Geophysical*, 850 F.3d at 798; *Sanchez v. Hacienda Records and Recording Studio, Inc.*, 2013 WL

529950, at *6 (S.D. Tex Feb. 11, 2013). "Without intent [to permit the use], there can be no implied

license." *Id.* (quotation and citation omitted). An implied license can arise even when each of the

*Lulirama* factors are not present but "where the totality of the parties' conduct supported such an

outcome." *See Baisden v. I'm Ready Productions*, 693 F.3d 491, 501 (2012).

## V.     The Parties' Contentions

### A.     TGS's motion for summary judgment

TGS makes four arguments: (1) Geophysical granted the Canada-Newfoundland and

Labrador Offshore Petroleum Board an express license to copy and distribute the seismic data; (2)

alternatively, Geophysical granted the Board an implied license to copy and distribute the seismic

data; (3) the Canada Oil and Gas Lands Administration's discretion to copy and distribute seismic

data does not affect Geophyiscal's license; and (4) the scope of the Board's license extends to

importation into the United States. (Docket Entry No. 96). Each of these arguments is summarized

below.

Though discovery was limited to the implied license issue, TGS makes an express license

argument in its summary judgment motion. *Id.* at 19. TGS argues that Geophysical's permit for its

seismic program included a provision stating that the "requirements and services of the Federal

agencies concerned are outlined in the publication 'Offshore Exploration.'" *Id.*; (Docket Entry No.

96, Ex. 6). The requirements and services outlined in the "Offshore Exploration" publication are:

(1) that operators like Geophysical must submit geophysical reports to the government as a condition

of conducting seismic surveys; and (2) that "copies of reports," including "seismic sections and

maps," could be purchased by third parties after the confidentiality period.  (Docket Entry No. 96, Ex. 7 at 61-62).

TGS next argues that Geophysical granted an implied license under either *Baisden*'s totality test or *Lulirama*'s three-factor test.  (Docket Entry No. 96 at 22).  TGS asserts that, under the *Baisden* totality test, the information and circumstances available to Geophysical at the relevant times show that Geophysical intended to grant the Board an implied license.  (Docket Entry No. 96 at 24).  TGS argues that at any "relevant time"—when Geophysical applied for its permit (March 24, 1982), or when it received the permit (May 4, 1982), or from the first and last days it submitted the seismic data at issue (November 26, 1982 and November 3, 1983)—ample information put Geophysical on notice that the submitted seismic data could be copied and distributed after the confidentiality period expired.  *Id.*  TGS provides three examples:

> 1. The April 1979 "Offshore Exploration," which preceded all of Geophysical's relevant activities, was incorporated into Geophysical's permit.  It provided the means by which third parties could "obtain[] copies of reports," including "seismic sections and maps."  (Docket Entry No. 96, Ex. 7 at 62).
>
> 2. The November 1982 "Geophysical Surveys on Canada Lands: Guidelines for Approvals and Reports," issued by the Canada Oil and Gas Lands Administration, expressly refer to "Offshore Exploration" as a "recommended reference publication" that "outline[d] the responsibilities and requirements of federal departments and agencies concerned with the offshore," and provided the list of "released geophysical/geological reports to April 1979."  (Docket Entry No. 96, Ex. 8 at ¶ 1).
>
> 3. The January 1983 "Released Geophysical and Geological Reports—Canada Lands," issued by the Canada Oil and Gas Lands Administration, which pre-dated at least four submissions of the seismic data, confirmed that released seismic lines would be "reproduce[ed]" and "duplicat[ed]" by a commercial firm, and identified 698 speculative and non-speculative geophysical programs that had already been released for reproduction and duplication.  (Docket Entry No. 96, Ex. 15 at 5).  Fourteen of the programs had been conducted by Geophysical.  *Id.* at App'x 3.

(Docket Entry No. 96 at 24).

TGS argues that, in addition to satisfying the *Baisden* test, Geophysical granted an implied license under the *Lulirama* test. (Docket Entry No. 96 at 26). TGS asserts that the first two of the *Lulirama* elements[2]—the licensee must request the creation of a work and the licensor must make the work and deliver it to the requesting licensee—are conceded in Geophysical's complaint. (Docket Entry Nos. 96 at 26, 1 at ¶¶ 28-29).[3] TGS asserts that the third element—the licensor must intend that the requesting licensee copy and distribute its work—is satisfied by the objective information and circumstances that Geophysical knew or should have known, as described above. (Docket Entry No. 96 at 26).

TGS next addresses two issues identified in the memorandum and opinion denying the motion to dismiss.[4] First, TGS argues that the Administration's discretion whether to copy and distribute submitted seismic data, authorized by the Canada Oil and Gas Act of 1982, does not affect the existence or validity of an implied license. (Docket Entry No. 96 at 27); *Geophysical Serv., Inc. v. Encana Corp. et al.*, 2016 ABQB 230, ¶ 163 (Ct. Queen's Bench of Alberta 2016). TGS cites two district court cases to support its argument that whether the Administration had discretion has no consequence for license existence or validity: *Grant Heilman Photography, Inc. v. McGraw-Hill*

---

[2] TGS refers to the *Lulirama* "factors." TGS incorrectly characterizes *Lulirama*. The *Lulirama* test is an element-based test, meaning that each element must be satisfied, as opposed to a factor-based test where each factor is considered but not necessary.

[3] The cited complaint paragraphs states: "28. Seismic service companies such as GSI and TGSN have at all material times been required by legislation in Canada to submit copies of collected seismic materials to various Canadian regulatory boards including the Canada-Newfoundland and Labrador Offshore Petroleum Board ("CNLOPB"). 29. CNLOPB is a Canadian federal/provincial regulatory board created pursuant to the Canada Newfoundland Atlantic Accord Implementation Act, S.C. 1987, c.3, as amended, and the Canada-Newfoundland and Labrador Atlantic Accord Implementation Act, R.S.N.L. Pursuant to the Newfoundland Offshore Area Petroleum Geophysical Operations Regulations, SOR 95-334, passed pursuant to the Canada Newfoundland Offshore Atlantic Accord Implementation Act S.C. 1987, c.3, GSI was required to, and did, submit to the CNLOPB a copy of the GSI Works."

[4] "Did the Board have discretion to decide whether to copy and send the data to those requesting it, as Geophysical argues? If so, does the Board's discretion affect whether Geophysical intended to grant an implied license that included copying and distribution? And if Geophysical granted an implied license, should Geophysical have reasonably expected the license to extend to importation of copies of its works into the United States?" (Docket Entry No. 86 at 26 (citations omitted)).

*Companies, Inc.*, 28 F. Supp. 3d 399, 405 (E.D. Pa. 2014) and *Warrick v. Roberts*, 34 F. Supp. 3d 913, 921 (N.D. Ill. 2014).  TGS asserts that the Administration and its predecessors were actively copying and distributing seismic data.  (Docket Entry Nos. 96, Ex. 7 at 66-68, Ex. 15 at App'x 3).

Second, TGS argues that the scope of Geophysical's license extended to allow the exportation of the seismic data into the United States.  (Docket Entry No. 96 at 28).  TGS cites the Eleventh Circuit's holding that "an implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered."  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010).  TGS claims that no record evidence shows that Geophysical sought or attempted to restrict the scope of the license.  (Docket Entry Nos. 96 at 2, Exs. 14, 16-18).

TGS's also notes that the Canadian regulatory regime itself made clear that there were no restrictions on the Administration's ability to export seismic data copies into the United States.  (Docket Entry No. 96 at 28).  TGS cites the declaration of Rowland J. Harrison,[5] who stated:

> 27. To begin with, nothing in the *Canada Oil and Gas Land Regulations*, the *Canada Oil and Gas Act*, the *Canada Petroleum Resources Act*, or the practices of [the Administration] limited dissemination of seismic data to within Canada.
>
> 28. To the contrary, the policy underlying the Regulatory Regime was to encourage exploration activities, including seismic surveying.  In the early 1980s, the offshore exploration industry in Canada was dominated by U.S. and other multinational companies like Mobil Oil (prior to its merger with Exxon), Exxon (through its indirect Canadian subsidiary Esso Resources), Chevron, Gulf, Shell, and Texaco. It would have made no sense to deprive these companies of access to seismic data. The purpose of the Regulatory Regime (encouraging offshore exploration) would have bene frustrated if the Regulatory Regime restricted access to seismic data in this way.  This is why the Regulatory Regime placed no nationality restrictions during the exploration stage of resource development (although the Regime did include certain financial incentives to encourage participation in exploration by Canadian companies).

---

[5] Harrison is a Canadian lawyer and former Administration employee with more than 40 years of experience in energy regulation and policy development as a senior government official, partner in a national law firm, consultant to governments and industry, and an academic.  (Docket Entry No. 96, Ex. 3).

(Docket Entry No. 96, Ex. 3 at ¶¶ 27-28). TGS, again relying on Harrison's declaration, points out that knew how to place restrictions on non-Canadian participation in the regulatory scheme, as evidenced by the restriction that *production* licenses could issue only to interest owners whose Canadian ownership rate was at least 50%. *Id.* at ¶ 29.

### B. Geophysical's Response

Geophysical argues that its knowledge and intent remain disputed because the facts TGS relies on relate to a different company. (Docket Entry No. 98 at 12). The seismic data at issue was created by a Delaware GSI, a Delaware entity. *Id.*[6] Geophysical did not purchase the data until 1994. *Id.* Geophysical argues that because its predecessor obtained the permit to perform the seismic surveys that resulted in the seismic data at issue, the evidence of what was known at the time is irrelevant and inconclusive as to Geophysical's intent. *Id.* at 13 ("Geophysical is the plaintiff here, and it is Geophysical's intent that matters.").

Geophysical also argues that TGS's express license argument is flawed because Geophysical did not grant *TGS* an express license. *Id.* at 21. Geophysical asserts that TGS is not in privity with Geophysical. *Id.* ("TGS is not a party to the permit, nor is TGS referred to in the permit. . . . There was no offer by or to TGS to enter into the permit, there was no acceptance by or from TGS to enter the permit, there was no meeting of the minds between Geophysical and TGS regarding the permit, and neither executed or delivered the permit to the other with the intent that it be mutual or binding."). Geophysical argues that TGS cannot enforce the license because TGS is not in privity with Geophysical. *See Jordan v. Sony BMG Music Entm't, Inc.*, 637 F. Supp. 2d 442, 451 (S.D. Tex. 2008) (one "may not enforce a contract to which he is not a party"). Additionally, Geophysical

---

[6] The surveys and their copyrights were purchased by Geophysical Speculative Incorporated in 1993. (Docket Entry Nos. 98 at 6 n.1, 98-3 at ¶ 22). Geophysical, the plaintiff in this case, purchased the surveys and their copyrights in 1994. (Docket Entry Nos. 98 at 6 n.1, 98-3 at ¶ 24(a)).

contends that TGS cannot claim third party beneficiary status because Geophysical did not "intend[] to secure a benefit to [TGS]," and Geophysical did not "enter[] into the contract directly for [TGS's] benefit." *Stine*, 80 S.W.3d at 589.

Geophysical next challenges TGS's implied license argument. (Docket Entry No. 98 at 22). Geophysical argues that none of the *Lulirama* elements are met. *Id.* at 25. First, Geophysical claims that because neither TGS nor the Administration requested the creation of the seismic-data copies, there was no request for the seismic data. *Id.* Rather, Geophysical created the works "as speculative seismic for non-exclusive licensing to energy and exploration companies." *Id.* Second, Geophysical contends that the seismic data was not delivered "to the licensee who requested it" because speculative seismic is not created by request. *Id.* Third, Geophysical argues that there is no "licensee-requester," and even if there was, there is no evidence that Geophysical intended the Administration to copy and distribute the seismic data to a requesting third party. *Id.*

Geophysical argues that Roland Harrison's testimony is inadmissible, and that TGS's reliance on Harrison's declaration is misplaced, because the declaration contains "opinions of law that go to the ultimate issues and fail to satisfy FRE 702." *Id.*; *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Geophysical asserts that Harrison's testimony is not based on facts or specialized knowledge helpful in determining whether Geophysical, or its predecessor Delaware GSI, knew or should have known that the Canadian regulatory regime could cause the seismic data submitted to be copied and distributed after the confidentiality period. (Docket Entry No. 98 at 26). Geophysical argues that TGS's implied-license arguments "are legal arguments that rely on its interpretation of Canadian legislation and regulations, not facts." *Id.* Lastly, Geophysical argues that the policies underlying United States copyright law, which encourage protecting individual

effort for personal gain, counsel against finding that Geophysical gave an implied license to allow its seismic data to be copied and exported into the United States. *Id.* at 28.

### C.     TGS's Reply

TGS contests Geophysical's argument that "what Delaware GSI should have known in the 1982-83 time frame [is] not relevant or pertinent." (Docket Entry Nos. 98 at 13, 99 at 11). According to TGS, "Geophysical argues that whether the Administration received an implied license to copy and distribute the [seismic data] in 1982 somehow can be determined based on Geophysical's subjective intent when it acquired the [seismic data] in 1994 . . . ." (Docket Entry No. 99 at 11). TGS's asserts that Geophysical's argument is foreclosed by the principle that a buyer of property acquires only the rights a seller has to sell. *Id.* In other words, if the Delaware entity granted an implied license, Geophysical could not obtain the seismic data free of the constraints of that license. Nor can Geophysical revoke a license supported by consideration. *Id.* at 11-12; *Lulirama*, 128 F.3d at 882. TGS offers a hypothetical to show the problems with Geophysical's argument:

> Geophysical's rule would allow a remorseful licensor to unwind the license simply by transferring ownership of the underlying work to an affiliated company. This case provides a good example of that perverse result, as David Einarsson is the former Delaware GSI vice president who both sold the GSI Works on behalf of Geophysical Speculative (as its president) and acquired the GSI Works on behalf of Geophysical (as its CEO). That David Einarsson may revoke a license by selling the underlying work to himself cannot be and is not the law.

*Id.* at 12 (citations omitted).

TGS argues that Geophysical has created a straw man by arguing that no license was granted *to TGS*. Docket Entry No. 99 at 7. Rather, TGS argues, the issue is whether Geophysical granted the Administration (and therefore the Board) an express license. *Id.* TGS asserts that Geophysical's argument "would impose copyright liability on any downstream recipient of a copyrighted work if

the work had been distributed by a licensee," which "would swallow the first sale doctrine nearly whole . . . ." *Id.* at 8. TGS disputes Geophysical's claim that TGS is trying to enforce rights under a contract to which it is not a party; instead, TGS asserts that Geophysical authorized the copying and distribution of the seismic data under the express terms of the Offshore Program Notice. *Id.*; (Docket Entry No. 96, Ex. 6).

TGS challenges Geophysical's reliance on only the *Lulirama* test for determining whether an implied license has been granted, citing *Baisden*. 693 F.3d at 501 ("[W]e have never held that an implied license could not arise in other circumstances where the totality of the parties' conduct supported such an outcome."). TGS also argues that Geophysical's argument that "TGS and Geophysical never had a relationship from which a meeting of the minds could be implied" is a red herring. (Docket Entry No. 99 at 11). Rather, it is objective facts evidencing the parties' intent that controls. *Id.* at 10-11; *Latimer*, 601 F.3d at 1235.

TGS defends its reliance on Harrison's testimony, asserting that his opinion "is rooted in facts, most of which originated from his own personal knowledge." (Docket Entry No. 99 at 16). Harrison served as the director general of the Land Management Branch of the Administration from January 1982 until July 1984. (Docket Entry No. 96, Ex. 3 at ¶ 25). Based on this experience, "Harrison dealt daily with industry and had personal knowledge of the issues and concerns (which he documented) that industry representatives expressed to him between 1982 and 1984." (Docket Entry No. 99 at 17).

TGS contests Geophysical's "ultimate issue" argument, quoting Federal Rule of Evidence 704(a), which states: "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED. R. EVID. 704(a). TGS cites a host of cases admitting expert testimony about what a reasonable person should

have known based on information available and circumstances existing at the time. *See, e.g., Garcia v. Mendeke*, 2016 WL 8739854, at *3 (W.D. Tex. Sept. 30, 2016); I*n re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 643 F. Supp. 2d 482, 498-99 (S.D.N.Y. 2009); *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 726 (E.D.N.C. 2007).

## VI.    Analysis

### A.    The Express License Issue

Two of Geophysical's arguments can be swiftly disposed of. First, Geophysical's argument that its knowledge and intent remains disputed because another entity—Delaware GSI—performed the seismic surveys and created the seismic reports is wrong. (Docket Entry No. 98 at 12). Although Geophysical did not purchase the seismic data and the related copyrights until 1994, (Docket Entry Nos. 98 at 6 n.1, 98-3 at ¶ 24(a)), Geophysical's purchase did not destroy any license Delaware GSI had given to the Administration. Delaware GSI could not transfer a right it did not have. "Copyright ownership is comprised of a bundle of rights; in granting a nonexclusive license . . . [an owner] has given up . . . one stick from that bundle . . . ." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 559 (9th Cir. 1990). Under *Lulirama*, Delaware GSI's license was revocable because it was supported by consideration. 128 F.3d at 882. TGS persuasively argues that holding otherwise is untenable: David Einarsson was the vice-president of Delaware GSI before becoming the vice-president of Geophysical Speculative, the company that bought the seismic data in 1993. He then became Geophysical's chief executive officer, and in that role he purchased the seismic data in 1994. (Docket Entry Nos. 84-1 at 49; 98-3 at 2-3). Agreeing with Geophysical would allow companies to sell their copyrights—even to a shell or subsidiary—in order to evade the consequences of their licenses. The relevant actions and intent are Delaware GSI's, not Geophysical's.

Second, Geophysical argues that no express license was granted to TGS because it was not a party to the seismic survey permit. (Docket Entry No. 98 at 20-21). This argument is unpersuasive. The relationship central to the license issue is not between Geophysical and TGS. Rather, the question is whether Geophysical granted a license to the Administration, and by operation of law, to the Board.[7] The license issue turns on whether Geophysical granted the Administration a license to copy, distribute, and export the seismic data the Administration received from Geophysical, after the confidentially period expired. Under Geophysical's logic, Geophysical could sue any company that ever received copies of Geophysical's data from the Administration or from the Board, because none of those companies was a party to the surveying permit. That is another red herring and wrong.

Turning to the merits of the express-license issue, Geophysical faces an uphill battle that it loses. Geophysical's only response to TGS's argument is that TGS was not a party to the permit nor in privity with Geophysical which, as discussed, is irrelevant. Instead, the question this court must answer is whether, by applying for and receiving an offshore-program permit, Geophysical granted the Administration an express license to copy and distribute the seismic data Geophysical was required to submit, after the confidentiality period ended. The undisputed facts are that Geophysical granted the Administration an express license, defeating Geophysical's sole remaining direct-infringement-by-unlawful-importation claim.

In the vacated motion to dismiss opinion issued in March, 2015, this court held that Geophysical agreed to comply with the Implementation Act and the Operations Regulations when it provided the Administration with the seismic data that resulted from the surveying. (Docket Entry

_____

[7] The Canada-Newfoundland Atlantic Accord Implement Act states that any licenses granted to the Administration transfer to the Canada-Newfoundland and Labrador Offshore Petroleum Board by operation of law. Canada-Newfoundland Atlantic Accord Implementation Act, S.C. 1987, c. 3 at § 205.

No. 28 at 16).  The Implementation Act, which was assented to in 1987, does not provide a basis for determining whether Geophysical granted the Board a license in 1982 or 1983, when Geophysical applied for a seismic surveying permit and submitted seismic data resulting from that surveying.

On the current record, TGS argues that Geophysical gave the Administration an express license to copy and release its seismic data by agreeing to the Administration's data-submission-and-release procedures incorporated into Geophysical's offshore-program notice application.  (Docket Entry No. 96 at 19).  The offshore-program notice that Geophysical signed on March 24, 1982, stated: "The requirements and services of the Federal agencies concerned are outlined in the publication 'Offshore Exploration.'"  (Docket Entry No. 96, Ex. 12).  On May 4, 1982, the Administration returned an approved offshore program notice, assigning Geophysical a new exploratory license number.  (Docket Entry No. 96, Ex. 13).  The approved notice contained the same reference to "Offshore Exploration": "The requirements and services of the Federal agencies concerned are outlined in the publication 'Offshore Exploration.'"  *Id.*

"Offshore Exploration" was issued by the Department of Energy, Mines and Resources' Resource Management Branch in April 1979.  (Docket Entry No. 96, Ex. 7).  The Administration succeeded the Department in January 1982.  (Docket Entry No. 96, Ex. 3 at ¶¶ 6-7)."Offshore Exploration" contains information and procedures for offshore operators.  The Foreword states:

> The Resource Management Branch manages and administers the federal interests in mineral resources off Canada's East and West Coasts and in Hudson Bay and Hudson Strait regions.
>
> "Offshore Exploration" is prepared by the Branch in response to the continuing need for liaison between the oil and mining industries and the various federal agencies concerned with Canada's interests offshore.  The main purposes of the publication are: to introduce to operating companies the responsibilities and requirements of federal agencies concerned with the Offshore; to note some of the services available through agencies; and to list the persons who may be contacted for assistance.  The publication is free and supersedes the sixth issue dated January 1977.  For those who

prefer a French language version of this publication, issue 7 (1978), entitled "Exploration au large des côtes" is available.

*Id.* at iii.

Appendix A of "Offshore Exploration" describes the availability of reports and well materials:

> Under the <u>Canada Oil and Gas Land Regulations</u> an operator is required to submit comprehensive reports on every program undertaken in connection with the permittee's offshore acreage. These reports, together with associated items such as cores, cutting and paleontological materials derived from drilling operations, are held strictly confidential for the requisite period, and then made available for public examination.
>
> Information submitted by a company can not be made available prior to its release from confidential status without the written consent of the company. Certain general data may be released at any time.
>
> <u>Release of Reports</u>
> . . .
>
> Reports of geological and geophysical surveys may be released two years after the surrender, cancellation or expiry of the permit. All such reports have been microfilmed, including seismic sections and maps. After release, paper copies of seismic sections are available for examination only in Ottawa. Other regions have microfilm copies of seismic sections. The written report plus maps are available in both forms.
> . . .
>
> <u>Obtaining Copies of Reports</u>
> . . .
>
> Geological and geophysical reports including seismic sections and maps may be purchased after expiry of the confidential period from:
>
> Orhans Reproductions and Photomapping Ltd.
> 907-9th Avenue S.W.
> Calgary, Alberta
> T2L 1L3

*Id.* at 61-62.

"Offshore Exploration" was incorporated into Geophysical's offshore-program notice.

(Docket Entry No. 96, Ex. 6).  The case law is helpful:

> Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together.  *See* 11 Williston on Contracts § 30:25 (4th ed. 1999) (hereafter "Williston") ("Where a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument.").
> . . .
>
> Under both general contract principles and admiralty law, a separate document will become part of the contract where the contract makes "clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt."  11 Williston at § 30:25; *see also New Moon Shipping Co.*, 121 F.3d at 30. Terms incorporated by reference will be valid so long as it is "clear that the parties to the agreement had knowledge of and assented to the incorporated terms."  11 Williston at § 30:25.  Notice of incorporated terms is reasonable where, under the particular facts of the case, "[a] reasonably prudent person should have seen" them.  *Coastal Iron Works*, 783 F.2d at 582.

*One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267-68 (5th Cir. 2011).

"Offshore Exploration" is clearly referred to by name in the offshore-program notice. (Docket Entry No. 96, Ex. 6) ("The requirements and services of the Federal agencies concerned are outlined in the publication 'Offshore Exploration'").  "Offshore Exploration" was issued by the Department of Energy, Mines and Resources, the same department that created the offshore program notice.  (Docket Entry No. 96, Exs. 6, 7).  The eighth issue of "Offshore Exploration," the issue cited above, was published in 1979, three years before Geophysical submitted its offshore-notice program. (Docket Entry No. 96, Ex. 7).  A reasonably prudent company engaged in offshore geophysical surveying should have seen the publication and been familiar with its terms.  Geophysical cannot say that it did not assent to the terms; it was Geophysical that submitted the offshore program notice containing the "Offshore Exploration" reference.  (Docket Entry No. 96, Ex. 6).

"Offshore Exploration" describes the procedures for submission and release of submitted materials, including "[r]eports of geological and geophysical surveys," "seismic sections and maps." (Docket Entry No. 96, Ex. 7 at 61). Geophysical argues that "TGS also fails to explain why an obscure reference in a technical government publication to a copying firm in Calgary (on the other side of Canada from where TGS obtained its copies) shows conclusively that Geophysical knew or should have known that years later the GSI Works at issue would be copied and imported by TGS from the [Board] in St. John's, Newfoundland." (Docket Entry No. 98 at 8). Geophysical misses the point. The question is whether *Offshore Exploration* provided for the copying and release of submitted seismic data—the specifics of how and where the physical copying and distribution would occur is irrelevant.

Finally, Geophysical put no limitation on the scope of its license. Geophysical did not object to the copying, distributing, or importing of the seismic data it submitted to the Administration. And, as Harrison stated in his declaration, "nothing in the *Canada Oil and Gas Land Regulations*, the *Canada Oil and Gas Act*, the *Canada Petroleum Resources Act*, or the practices of [the Board] limited dissemination of seismic data to within Canada." (Docket Entry No. 96, Ex. 3 at ¶ 27).

TGS's summary judgment motion is granted. The undisputed record evidence shows that Geophysical granted the Board an express license to copy and export Geophysical's submitted seismic data.

## B. The Implied License Issue

Even if Geophysical did not grant the Board an express license, the undisputed evidence shows that Geophysical knew or should have known that it granted an implied license to copy and export Geophysical's submitted seismic data.

Under the *Baisden* test, an implied license can arise "where the totality of the parties' conduct supported such an outcome." 693 F.3d at 501. "Courts focus on objective evidence revealing the intent of the parties to determine if an implied license exists, and this inquiry also reveals the scope of that license." *Latimer*, 601 F.3d at 1235; *Brinkman v. Beaulieu of Am., Inc.*, 2002 WL 32097534, at *4 (W.D. Tex. Oct. 29, 2002), *aff'd sub nom. Brinkman v. Beaulieu of Am.*, 67 F. App'x 243 (5th Cir. 2003) ("A court may find an implied license . . . when such a license can be reasonably inferred from the objective conduct of the parties."). Even if Geophysical did not give the Board an express license, the objective evidence that TGS has provided regarding its express license argument shows that Geophysical should have known that by submitting an offshore program notice and participating in the seismic data submission regime, it was impliedly granting a license to the Board to copy and distribute the seismic data. Geophysical offers no evidence in its argument that would create a material fact dispute.

First, "Offshore Exploration" was available to Geophysical, without any charge. It predated Geophysical's offshore-program notice submission by three years. (Docket Entry No. 96, Ex. 7). A company operating in the geophysical surveying industry clearly could have, and should have, been aware of the contents of a publication issued by the Department of Energy, Mines and Resources (the department that managed and administered the federal interests in mineral resources off Canada's coasts and in the Hudson Bay and Hudson Strait regions) that detailed "information and procedures for offshore operators." *Id.* This is particularly true for Geophysical, because it submitted an offshore-program notice that explicitly referenced "Offshore Exploration." (Docket Entry No. 96, Ex. 6).

Second, in November 1982, the Administration issued another free publication, "Geophysical Surveys on Canada Lands: Guidelines for Approvals and Reports."  (Docket Entry No. 96, Ex. 8). The "Guidelines for Approvals and Reports" also expressly referred to "Offshore Exploration":

> The booklet "Offshore Exploration" is recommended as a reference publication for all activities pertaining to exploration in the eastcoast offshore region.  It outlines the responsibilities and requirements of federal departments and agencies concerned with the offshore and notes some of their services; lists persons who may be contacted for assistance; provides a summary of exploratory work done to date; and lists geophysical/geological reports to April 1979.

*Id.* at ¶ 1.  Geophysical should have been aware of the contents of "Offshore Exploration" because earlier in this litigation, Geophysical admitted that it was aware of the "Guidelines for Approvals and Reports."  Geophysical argued it could not have granted a license to copy its submitted seismic data because the "Guidelines for Approvals and Reports" "never mention copyright, importation, a privilege period, confidentiality matters, or the manner in which information or documentation may be disclosed."  (Docket Entry No. 84 at 11).  Having admitted that it was aware of and relied on "Guidelines for Approvals and Reports," Geophysical cannot argue that it did not, or should not, have known about "Offshore Exploration."

Third, and finally, in January 1983, the Administration issued "Released Geophysical and Geological Reports—Canada Lands."  (Docket Entry No. 96, Ex. 15).  The "Reports" predate at least four of Geophysical's submissions of its seismic data.  (Docket Entry No. 96, Ex. 11 at 4, Ex. 15).  *Reports* confirmed that released seismic lines would be "reproduce[ed]" and "duplicat[ed]" by a commercial firm, and identified 698 speculative and non-speculative geophysical programs that had already been released for reproduction and duplication.  (Docket Entry No. 96, Ex. 15 at 5).  Even if Geophysical had been unaware of the fact that the Board could copy and distribute seismic

data it received from permitted geophysical surveyors, Geophysical should have known that the four post-"Reports" submissions could have been copied and imported.

Geophysical makes the same mistake in its implied-license argument that it did in its express-license argument, by conflating or confusing the Board with TGS. Geophysical argues that "TGS has offered no evidence of any meeting of the minds between it and Geophysical." (Docket Entry No. 98 at 24). The proper inquiry is whether there was a meeting of the minds between Geophysical and the Board. There was clearly a meeting of the minds between Geophysical and the Board, as shown by: Geophysical's submission of, and the Board's approval of, the offshore-program notice; the Board's publications describing the submission and release procedures for seismic data; and Geophysical's submission of its seismic data in accordance with the Canadian laws and regulations.

Geophysical attacks Harrison's declaration, arguing that has no specialized knowledge that would assist in determining what Geophysical knew or should have known in 1982 and 1983. (Docket Entry No. 98 at 25). Geophysical also argues that TGS's reliance on "that rely on [TGS's] interpretation of Canadian legislation and regulations, not facts" are legal arguments that cannot show an implied license. *Id.* at 26. Geophysical is wrong. First, Harrison meets the Rule 702 expert standard. His lengthy background in the industry shows that he has experience and knowledge helpful in determining what a company in Geophysical's position knew or should have known during the relevant period. FED. R. EV. 702. Second, TGS does not rely only on its interpretation of Canadian legislation and regulations. It also accounts for Geophysical's actions; namely, submitting the offshore program notice and participating in the seismic-data-submission procedures. Geophysical's and the Board's conduct amply supports finding that Geophysical granted the Board with an implied license to copy, distribute, and export Geophysical's submitted seismic data.

The undisputed evidence shows that, as a matter of law, Geophysical granted the Board an implied license to copy and export Geophysical's submitted seismic data.

## VII. Conclusion

TGS's summary judgment motion is granted, (Docket Entry No. 96), on the basis of an implied license and, as an alternative, an express license. Because TGS has shown that Geophysical granted the Board a license to copy, distribute, and export the seismic data it submitted to the Board, Geophysical's sole remaining direct-infringement-by-unlawful-importation claim fails. Final judgment is entered separately.

SIGNED on June 19, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge