**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| GEOPHYSICAL SERVICE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-1368 |
| | § | |
| TGS-NOPEC GEOPHYSICAL COMPANY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON TGS'S RENEWED MOTION FOR ATTORNEY'S
FEES AND COSTS**

In 2014, Geophysical Service, Inc., sued TGS-NOPEC Geophysical Company ("TGS") for allegedly infringing its copyright by purchasing copies of seismic data that Geophysical had provided to the Canadian government in the early 1980s. After two motions to dismiss, a motion for reconsideration, a motion for summary judgment, and two appeals to the Fifth Circuit, TGS has moved for attorney's fees and costs incurred defending against Geophysical's claims. Based on the parties' briefs, the record, and the applicable law, the court grants in part and denies in part TGS's motion, awarding $878,314.00 for the fees it reasonably incurred in defending this action, and $4,168.75 in taxable costs.

The reasons are explained below.

## I.    Procedural History

Geophysical initially asserted three claims against TGS: (1) direct infringement, by unlawfully importing copies of Geophysical's seismic data, and by preparing additional copies and derivative copies; (2) contributory infringement, by asking the Canadian government to copy Geophysical's data; and (3) unlawful removal of copyright management information. (Docket Entry No. 1).

TGS moved to dismiss, and the court granted TGS's motion, finding that Geophysical granted the Canadian government an implied license to copy and distribute its seismic data. (Docket Entry No. 10; Docket Entry No. 28 at 20–21, 26). The court granted Geophysical leave to amend its claims that were based on TGS's copying and distributing Geophysical's data. (Docket Entry No. 28 at 26). Geophysical instead moved for reconsideration, stating that it was "not able to file an amended complaint that would satisfy the Court's requirements." (Docket Entry No. 32 at 5). The parties correctly stated on reconsideration that the court's March 30, 2015, opinion relied on grounds the parties had not expressly raised. (Docket Entry No. 43 at 1–2).

The court granted Geophysical's motion for reconsideration, vacated its previous opinion, and entered a new order granting TGS's motion to dismiss. (Docket Entry No. 43). The reasons were different, but the result was the same. (*Id.* at 2). TGS then moved for attorney's fees and costs. (Docket Entry No. 45). The court found that Geophysical's claims lacked factual support and were objectively unreasonable, awarding TGS $132,888.00 in attorney's fees and $236.95 in taxable costs incurred before November 9, 2015. (Docket Entry No. 51 at 4–6, 14).

Geophysical appealed to the Fifth Circuit. (Docket Entry Nos. 48, 52). The Fifth Circuit affirmed this court's dismissal of Geophysical's contributory infringement claim, its claim for removal of copyright management information, and its claim for direct infringement "to the extent that it was based on infringing acts by TGS after it received copies of Geophysical's seismic lines." (Docket Entry No. 57 at 21–22). The Fifth Circuit reversed and remanded the dismissal of Geophysical's direct-infringement claim, "to the extent that it was based on importation of unlawfully made copies." (*Id.* at 22). The court explained that on remand, this court "must first decide whose law governs the determination whether the copies imported by TGS were 'lawfully made' under § 109. It must then apply the legal principles that it determines to govern." (*Id.* at

17).  This court had not reached that choice-of-law issue, instead concluding that the act-of-state doctrine precluded finding the Canadian government's actions unlawful.  (*Id.* at 14).  The Fifth Circuit vacated the attorney's fee award because of the remand, and "because of a relevant intervening Supreme Court decision," with leave to "reconsider at the appropriate time after its disposition of the remanded claim."  (*Id.* at 21–22).

On remand, this court denied TGS's motion to dismiss, finding that United States law applied to determine whether the imported copies were lawfully made, and that the record at the motion-to-dismiss stage was insufficient to dismiss based on TGS's fair use or implied license defenses.  (Docket Entry No. 62; Docket Entry No. 86 at 18, 24, 27).  After discovery, TGS moved for summary judgment.  (Docket Entry No. 96).  The court granted summary judgment and entered final judgment in favor of TGS.  (Docket Entry Nos. 101, 102).  The court found that, based on the undisputed evidence, Geophysical had granted the Canadian government an implied license, or alternatively, an express license, to copy and distribute its seismic data.  (Docket Entry No. 101 at 27).  The court based this ruling on evidence that Geophysical's permit for its seismic program included a provision referring to requirements outlined in the publication "Offshore Exploration." (Docket Entry No. 96-6).  Those requirements were (1) that operators like Geophysical must submit geophysical reports to the government as a condition of conducting seismic surveys; and (2) that "copies of reports," including "seismic sections and maps," could be purchased by third parties after the confidentiality period.  (Docket Entry No. 96-7 at 68–69).  The court entered final judgment, and TGS moved for its attorney's fees and costs.  (Docket Entry No. 102, 103).

Geophysical appealed again, and this court denied TGS's motion for attorney's fees, with leave to refile after the appeal.  (Docket Entry Nos. 104, 115).  This time, the Fifth Circuit affirmed in a per curiam opinion.  *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.* (*Geophysical*

*II*), 784 F. App'x 253, 258 (5th Cir. 2019), *petition for cert. filed*, (U.S. Jan. 14, 2020) (No. 19-873). The Fifth Circuit held that "the totality of the parties' conduct proves that Geophysical granted the [Canadian government] an implied license to copy and distribute the [seismic data.]" *Id.* at 256.

TGS then renewed its motion for attorney's fees and costs; Geophysical responded; TGS replied; and Geophysical filed a surreply. (Docket Entry Nos. 118, 123, 126, 127).

## II.    Attorney's Fees under the Copyright Act

### A.    Whether TGS is Entitled to a Fee Award

Section 505 of the Copyright Act provides:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505.[1]

In *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 520–21 (1994), the Supreme Court rejected the "dual" standard under which "prevailing plaintiffs are generally awarded attorney's fees as a matter of course, while prevailing defendants must show that the original suit was frivolous or brought in bad faith." "Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, . . . defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Id.* at 527. The Court made clear that it was not adopting the "British Rule" of awarding "attorney's fees as a matter of

---

[1] Under § 505, attorney's fees are a type of cost, but they are analyzed separately from other costs. *See Adsani v. Miller*, 139 F.3d 67, 75 (2d Cir. 1998).

course." *Id.* at 533. Instead, "attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Id.* at 534.

"[A]n award of attorney's fees to the prevailing party in a copyright action is the rule rather than the exception and should be awarded routinely." *Virgin Records Am., Inc. v. Thompson*, 512 F.3d 724, 726 (5th Cir. 2008) (per curiam) (quotation marks omitted). That said, "recovery of attorney's fees is not automatic." *Id.* (the district court did not abuse its discretion in denying a motion for an award of attorney's fees under § 505). In determining a fee award, a court may consider the following nonexclusive factors: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* (quoting *Fogerty*, 510 U.S. at 534 n.19).

A court "should give substantial weight to the objective reasonableness of the losing party's position," but "must also give due consideration to all other circumstances relevant to granting fees; and it retains discretion, in light of those factors, to make an award even when the losing party advanced a reasonable claim or defense." *Kirtsaeng v. John Wiley & Sons, Inc. (Kirtsaeng II)*, 136 S. Ct. 1979, 1983 (2016).

### 1.  Frivolousness or Objective Unreasonableness

TGS argues that Geophysical's claims were objectively unreasonable, if not frivolous, because Geophysical knew, or should have known, that it had granted a license to the Canadian government to distribute its seismic data after the confidentiality period ended. Geophysical responds that TGS is arguing with the benefit of hindsight, and that Geophysical could not have known before asserting its claims what legal theories and evidence this court would eventually find persuasive.

The first factor in deciding whether to award a prevailing party its fees is the frivolousness or objective unreasonableness of the opposing party's claims or defenses. "'Objective unreasonableness' is generally used to describe claims that have no legal or factual support." *Viva Video, Inc. v. Cabrera*, 9 F. App'x. 77, 80 (2d Cir. 2001) (per curiam). There is a difference between a suit that is "without merit" and one that is "patently frivolous." *See Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 382 n.23 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Although "[t]he Supreme Court has explicitly approved of a district court considering frivolity . . . as [one] of the multiple factors in a non-exclusive list [that] may guide the court's discretion over attorney's fees in copyright cases," *id.* at 382, *Fogerty* rejected the "dual" standard of awarding prevailing defendants fees only if "the original suit was frivolous or brought in bad faith," 510 U.S. at 520–21. "*Fogerty* did not reject the dual rule in order to add a clone." *Edwards v. Red Farm Studio Co.*, 109 F.3d 80, 82 (1st Cir. 1997).

*Guzman v. Hacienda Records and Recording Studio, Inc.*, Civ. A. No. 6:12-CV-42, 2015 WL 4612583 (S.D. Tex. July 31, 2015), is instructive. The district court found that the plaintiff's copyright infringement claims were not objectively unreasonable, even though they were ultimately unsuccessful at trial. *Id.* at *2. The plaintiff had the burden to show that the defendant had access to his copyrighted song to prove copying. *Id.* The court noted that the plaintiff's claim survived summary judgment, indicating that it was neither patently frivolous nor objectively unreasonable. *Id.* At trial, the court extensively analyzed whether the defendant had access to the plaintiff's copyrighted song. *Id.* at *3. "[W]hile it ultimately disagreed with [the plaintiff's] view that the evidence supported an access finding, it was [a] question on which reasonable factfinders may disagree." *Id.* The court explained that the evidence supported a finding of substantial

similarity, although the lack of access meant it was unnecessary to reach the issue. *Id.* The substantial similarity, as well as the close question of access, supported finding the claim not objectively unreasonable. *Id.* at *5. In contrast, when a plaintiff's claims are objectively unreasonable because the legal issues are clear and no circuit cases support the plaintiff's position, the case law supports awarding the defendant its fees. *Coles v. Wonder*, 283 F.3d 798, 803 (6th Cir. 2002).

This court initially found two of Geophysical's claims to lack factual support. In its first Memorandum and Order on TGS's Motion for Attorney's Fees and Costs, (Docket Entry No. 51), this court stated:

> Although Geophysical's direct-infringement claim was not patently frivolous, the record shows that claim lacked factual support. This court found that "Geophysical's allegations that TGS copied and distributed its seismic lines without including the copyright-management information [were] conclusory and speculative." So were its allegations that "TGS infringed by using the seismic lines the [Canadian government] sent to find locations for its own surveying work." The court granted Geophysical leave to amend its complaint. Geophysical instead moved for reconsideration, acknowledging that it was "not able to file an amended complaint that would satisfy the Court's requirements" under Federal Rule of Civil Procedure 8(a).

(Docket Entry No. 51 at 4) (citations removed). The Fifth Circuit affirmed this court's dismissal of the copyright-management claim and derivative-work claim because Geophysical did not raise them on appeal. *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co. (Geophysical I)*, 850 F.3d 785, 792 (5th Cir. 2017).

As to Geophysical's contributory-infringement claim, while this court initially dismissed the claim on the implied-license theory, on reconsideration, it found "at least three independent reasons supporting dismissal." (Docket Entry No. 51 at 4). The court explained that "[t]he reasons changed on reconsideration, but it was the strength of TGS's defenses—not the strength of Geophysical's contributory-infringement claim—that the court reevaluated. The claim was not

patently frivolous, but it sought an aggressive expansion of copyright in an international context." (*Id.*). The Fifth Circuit affirmed the dismissal, holding that when "a copyright plaintiff claims contributory infringement predicated on direct infringement that occurred entirely extraterritorially, the plaintiff has stated no claim." *Geophysical I*, 850 F.3d at 799–800. The Fifth Circuit recognized that neither it nor the Supreme Court had addressed the issue before. *Id.* at 798.

As to the remaining unlawful-importation part of the direct-infringement claim on appeal, the Fifth Circuit reversed and held that the act-of-state doctrine did not apply, and remanded because Geophysical raised a new legal question on appeal that this court had not had the chance to address: whether United States or Canadian law determines if a copy was lawfully made under the first sale doctrine. *Id.* at 796. The Fifth Circuit noted that "if the district court finds that United States law controls, then it may revisit its initial inclination that Geophysical granted the [Canadian government] an implied license—though the creation of an implied license, which turns on the copyright holder's intent, is a fact question." *Id.* at 798.

The Fifth Circuit then vacated the fee award because the court "remand[ed] this case for further development on one of Geophysical's claims, and because of a relevant intervening Supreme Court decision." *Id.* at 800. The Fifth Circuit stated that this court "may consider in its entertainment of [a renewed motion for attorney's fees] the dismissal of the claims that we affirm here." *Id.*

Geophysical argues that the two novel questions raised on appeal weigh against finding its claims objectively unreasonable. (Docket Entry No. 123 at 12–13). But Geophysical's claims did not turn on those questions. On remand, Geophysical argued that United States copyright law controlled whether the copies TGS imported were lawfully made, while TGS argued that Canadian law controlled because the copying occurred in Canada. (Docket Entry No. 86 at 11–12). This

court agreed with Geophysical that United States copyright law controlled and denied TGS's motion to dismiss because, among other reasons, TGS's defense of implied license could not be resolved on the then-existing record. (*Id.* at 25–26).

The parties completed discovery limited to the implied-license issue, and TGS moved for summary judgment. (Docket Entry No. 96). The court granted TGS's motion, finding that Geophysical had granted the Canadian government an express license, or alternatively, an implied license. (Docket Entry No. 101 at 23, 27). As to the express license, the court "swiftly disposed of" Geophysical's arguments as "untenable," "irrelevant," raising a "red herring and wrong." (*Id.* at 18–19). This court stated that a "reasonably prudent company engaged in offshore geophysical surveying should have seen the publication and been familiar with its terms. Geophysical cannot say that it did not assent to the terms; it was Geophysical that submitted the offshore program notice containing the 'Offshore Exploration' reference." (*Id.* at 22). As to the implied license, this court concluded that even if there was no express license, "the undisputed evidence shows that Geophysical knew or should have known that it granted an implied license to copy and export Geophysical's submitted seismic data." (*Id.* at 23).

The court reached this result by applying United States copyright law, as Geophysical argued should apply. The issue of which country's law applied, raised on appeal and litigated on remand, did not affect Geophysical's direct-infringement claim because the court still concluded, on summary judgment, that Geophysical had licensed the Canadian government to copy and distribute its seismic data. The ruling was wholly foreseeable, because the court granted TGS's first motion to dismiss based on the same implied-license theory, (Docket Entry No. 28 at 20–21), and vacated that opinion only because the parties correctly stated that TGS had not raised the implied-license defense in its briefs. The Fifth Circuit also stated that this court could revisit the

implied-license issue on remand, after determining which law applied under the first-sale doctrine. The choice-of-law question had no effect, nor could it have, on the success of Geophysical's direct-infringement claim, which turned on whether Geophysical had granted a license to the Canadian government by submitting the seismic data under the "Offshore Exploration" terms. For the same reason, Geophysical's contributory-infringement claim did not turn solely on the extraterritoriality question it presented on appeal, even though the Fifth Circuit affirmed the dismissal by answering that question.

Geophysical argues that it was not unreasonable to believe that it could defeat TGS's license defense because there was no explicit written agreement and no evidence of a "meeting of the minds" between Geophysical and TGS in 1982. (Docket Entry No. 123 at 16). But when Geophysical raised the same argument on summary judgment, this court explained:

> Geophysical makes the same mistake in its implied-license argument that it did in its express-license argument, by conflating or confusing the [Canadian government] with TGS. Geophysical argues that TGS has offered no evidence of any meeting of the minds between it and Geophysical. The proper inquiry is whether there was a meeting of the minds between Geophysical and the [Canadian government]. There was clearly a meeting of the minds between Geophysical and the [Canadian government], as shown by: Geophysical's submission of, and the [Canadian government's] approval of, the offshore-program notice; the [Canadian government's] publications describing the submission and release procedures for seismic data; and Geophysical's submission of its seismic data in accordance with the Canadian laws and regulations.

(Docket Entry No. 101 at 26) (quotations and citations removed).

Nor does the absence of a written agreement make Geophysical's claims reasonable. The "Offshore Exploration" publication is explicitly referred to in Geophysical's permit. This court explained:

> "Offshore Exploration" is clearly referred to by name in the offshore-program notice. (Docket Entry No. 96, Ex. 6) ("The requirements and services of the Federal agencies concerned are outlined in the publication 'Offshore Exploration'"). "Offshore Exploration" was issued by the Department of Energy, Mines and

> Resources, the same department that created the offshore program notice. The eighth issue of "Offshore Exploration," the issue cited above, was published in 1979, three years before Geophysical submitted its offshore-notice program. A reasonably prudent company engaged in offshore geophysical surveying should have seen the publication and been familiar with its terms. Geophysical cannot say that it did not assent to the terms; it was Geophysical that submitted the offshore program notice containing the "Offshore Exploration" reference.

(Docket Entry No. 101 at 22) (citations removed).

Geophysical unpersuasively argues that TGS enjoys the benefit of hindsight. According to Geophysical, because the document that refers to "Offshore Exploration" "does not mention the possibility of future release of [Geophysical's seismic data] or any other of Geophysical's works," Geophysical could not have known when it filed the case that this court would treat the permit as granting a license. Geophysical also argues that it could not have foreseen that this court would adopt the "totality of the parties' conduct" test or rely on a particular affidavit as evidence. (Docket Entry No. 123 at 16, 18). These arguments miss the point. Both Geophysical's permit application and approved permit contained the same clear reference to the requirements outlined in "Offshore Exploration." A "reasonably prudent company engaged in offshore geophysical surveying should have seen the publication and been familiar with its terms." (Docket Entry No. 101 at 22). Which individual affidavit this court found persuasive, or whether the totality of the circumstances test applied, are irrelevant.

Geophysical also argues that a 2016 decision by the Alberta Court of Queen's Bench, holding that Geophysical granted the Canadian government a compulsory license and rejecting the defendants' implied-license arguments, shows that Geophysical could not have predicted this court's decision. (Docket Entry No. 123 at 16–17). While Geophysical argues that a "compulsory license" has "no analogy in U.S. law," (Docket Entry No. 123 at 17), Geophysical has failed to show that the Canadian court's ruling affects this case. Geophysical has not shown that Canadian

law on implied license mirrors United States law, or that the record in the Canadian case was substantially the same as in this case.

The court finds that Geophysical's claims were objectively unreasonable because they lacked factual support and were undermined by the language in Geophysical's own permit that granted the Canadian government a license to copy its seismic data.

### 2. The Parties' Motivation in Filing Suit

The record does not show that Geophysical had a bad-faith basis for filing this copyright-infringement suit, nor has TGS argued that Geophysical acted in bad faith. This factor does not weigh in favor of awarding attorney's fees.

### 3. Compensation and Deterrence

The third factor in deciding whether to award fees is the need for compensation and deterrence. "[U]nlike civil rights suits, where while a prevailing plaintiff is presumptively entitled to an award of fees, a prevailing defendant is entitled to such an award only if the suit was groundless, in copyright suits 'prevailing plaintiffs and prevailing defendants are to be treated alike.'" *Assessment Techs., LLC v. WIREdata, Inc.*, 361 F.3d 434, 436 (7th Cir. 2004) (citations omitted) (quoting *Fogerty*, 510 U.S. at 534). "If the case was a toss-up and the prevailing party obtained generous damages, or injunctive relief of substantial monetary value, there is no urgent need to add an award of attorneys' fees. But if at the other extreme the claim or defense was frivolous and the prevailing party obtained no relief at all, the case for awarding him attorneys' fees is compelling." *Id.* at 436–37 (citation omitted).

The need for compensation supports a fee award here. In *Fogerty*, the Supreme Court directed courts to harmonize fee awards under § 505 with the statutory and constitutional aims of

copyright law. 510 U.S. at 525. The Court discussed how the successful defense of a copyright-infringement action serves copyright law's underlying purposes:

> Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement.

*Id.* at 527.

TGS spent almost six years defending against Geophysical's claims. Without compensation for its attorney's fees, TGS may not have been motivated to pursue its meritorious defenses. Geophysical has brought similar claims against other entities. TGS's successful defense should encourage other defendants to litigate meritorious defenses, supporting a fee award. *See Mattel, Inc. v. MGA Entm't, Inc.*, 705 F.3d 1108, 1111 (9th Cir. 2013) ("MGA's 'failure to vigorously defend against Mattel's claims could have ushered in a new era of copyright litigation aimed not at promoting expression but at stifling the 'competition' upon which America thrives.'").

Without a fee award, a defendant could have little incentive "to obtain nonexclusive access to the intellectual public domain." *Assessment Techs.*, 361 F.3d at 436. This would upset the important balance in copyright law between the "competing claims," both necessary, of providing private motivation for the public availability of creative work:

> Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts. The immediate effect of our copyright law is to secure a fair return for an author's creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good.

*Fogerty*, 510 U.S. at 526–27 (quotation marks omitted).

Deterrence also supports awarding TGS fees for defending against Geophysical's objectively unreasonable claims. "The cases show that when a copyright-infringement claim is objectively unreasonable, deterrence is an important factor." *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 796–97 (S.D. Tex. 2009) (collecting cases). Deterrence weighs heavily when, as here, Geophysical has brought similar claims involving the same data against other defendants. (Docket Entry No. 126 at 14 n.2). While Geophysical argues that the data at issue in its other cases come from different years, that does not detract from the need for deterrence. Geophysical admits that the 1982 information at issue here is also at issue in the other cases. (Docket Entry No. 127 at 8–9). Even if the other cases involve some information that Geophysical did not license, the fact that Geophysical licensed the 1982 information is relevant to the other cases.

Finally, Geophysical argues that TGS deserves no compensation because TGS has already profited by using Geophysical's data. This argument assumes that Geophysical's data was protected from TGS's use. It was not.

The goals of compensation and deterrence both weigh in favor of awarding TGS attorney's fees.

### 4.    Balancing the Factors

Applying the standard from *Kirtsaeng II*, this court "should give substantial weight to the objective reasonableness of the losing party's position," but "must also give due consideration to all other circumstances relevant to granting fees; and it retains discretion, in light of those factors, to make an award even when the losing party advanced a reasonable claim or defense." *Kirtsaeng II*, 136 S. Ct. at 1983. Geophysical asserted objectively unreasonable claims, which weighs substantially in favor of awarding attorney's fees. And while the record does not show bad faith on Geophysical's part, the goals of compensation and deterrence favor awarding attorney's fees.

The balance of the *Fogerty* factors, applied as directed by the Supreme Court in *Kirtsaeng II*, supports a fee award.

**B.      The Lodestar Calculation**

**1.      The Hourly Rates**

The first step in computing the lodestar is determining a reasonable hourly rate.   The prevailing market rate for similar services by similarly trained and experienced lawyers in the relevant legal community is the established basis for determining a reasonable hourly rate.   *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002).   The party seeking fees bears the burden of establishing the market rate and should present the court with evidence from which the court can determine the reasonableness of the proposed rate.   *Riley v. City of Jackson*, 99 F.3d 757, 760 (5th Cir. 1996).

Attorneys from Norton Rose Fulbright represented TGS throughout the litigation.   One partner, Melanie Rother, and one senior associate, Peter Tipps, primarily staffed the case.   Other Norton Rose Fulbright attorneys periodically contributed, based on their areas of expertise or their lower billing rates.   The lawyers included appellate partners Joy Soloway, Katherine Mackillop, and Jonathan Franklin; copyright partner Alicia Groos; and younger associates Andrew Elkhoury, Phillip Tarpley, and Justin White.   (Docket Entry No. 118 at 12).   A senior paralegal, Maria Torres, assisted.   (*Id.* at 13).   Rother states in her affidavit that she "primarily focuses on complex commercial and business litigation," including intellectual property disputes; that she is "familiar with the usual and customary fees charged for federal court cases such as this copyright infringement action"; and that "these rates are reasonable for attorneys with [her and Tipps's] level[s] of skill and experience."   (Docket Entry No. 118-2 at 1–2).

Rother states that the billing rates she and Tipps used increased during the litigation. Rother initially billed at $580 per hour, which increased each year to "$617.50 in 2016; $641.00 in 2017; and $675.00 per hour in 2018 and 2019." (*Id.* at 2). Tipps's hourly rate began at $455 and increased to "$527.25 per hour in 2016; $613.00 per hour in 2017; and $641.00 per hour in 2018 and 2019." (*Id.*).

The court takes judicial notice of the Texas State Bar's "2015 Hourly Rate Fact Sheet."[2] This report states that in 2015, the median hourly rate for Houston attorneys litigating intellectual property cases was $345; the median hourly rate for Houston appellate attorneys was $325; the median hourly rate for Houston attorneys at firms with between 201 and 400 lawyers[3] was $354; the median hourly rate for Houston attorneys with between 11 to 15 years of experience, like Rother, was $257 per hour; the median hourly rate for Houston attorneys with 7 to 10 years of experience, like Tipps, was $265 per hour; the median hourly rate for Houston attorneys with over 25 years of experience, like Soloway, Mackillop, and Franklin, was $300; the median hourly rate for Houston attorneys with 16 to 20 years of experience, like Groos, was $300; the median hourly rate for Houston attorneys with 3 to 6 years of experience, like Elkhoury and Tarpley, was $250; and the median hourly rate for Houston attorneys with 2 or less years of experience, like White, was $213.[4] Courts in this district have found rates between $75 and $125 per hour to be reasonable rates for paralegal work. *See Ramirez v. Lewis Energy Grp., L.P.*, 197 F. Supp. 3d 952, 957 (S.D. Tex. 2016) (citing *Rouse v. Target Corp.*, 181 F. Supp. 3d 379, 390–91 (S.D. Tex. 2016)).

---

[2]     *2015 Hourly Rate Fact Sheet*, State Bar of Texas (Aug. 2016), *available at* https://www.texasbar.com/AM/Template.cfm?Section=Archives&Template=/CM/ContentDisplay.cfm&ContentID=34182 (last visited Feb. 13, 2020).

[3]     Norton Rose Fulbright employs 249 attorneys in its Houston office. NALP Directory of Legal Employers, "Norton Rose Fulbright: Houston, Texas," *available at* https://www.nalpdirectory.com/employer_profile?FormID=10965&QuestionTabID=34&SearchCondJSON=%7B%22SearchEmployerName%22%3A%22norton%22%7D (last visited Feb. 13, 2020).

[4]     *2015 Hourly Rate Fact Sheet*, *supra* note 2 at 6–13.

Geophysical argues that TGS has failed to offer evidence that its proposed lodestar amount is reasonable. But Geophysical has not provided evidence that the rates are unreasonable, except to cite this court's vacated fee award reducing TGS's hourly rates before awarding a fee. (Docket Entry No. 51 at 7–8). Nor has Geophysical suggested a reasonable rate. The prevailing market rates for similarly situated attorneys litigating intellectual property disputes and appeals in large firms are significantly lower than TGS's attorneys' rates. The court also considers in its analysis that the Texas State Bar numbers are five years old, and that attorneys' fees rates usually increase from year to year, as they have here.

The median rate for all lawyers at firms within a certain size range is not, however, the end of the reasonable-hourly-rate analysis. Courts also consider the complexity of the legal issues, the novelty of the claims, and the complexity and nature of the facts. The expertise and skill of the lawyers is another factor. "Four of the *Johnson* factors—the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation—are presumably fully reflected in the lodestar amount." *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993);[5] *see also Abrams v. Baylor Coll. of Med.*, 805 F.2d 528, 536 (5th Cir. 1986) ("The *Johnson* factors govern the determination of reasonableness itself; they are not merely factors to be considered in adjusting the award once the lodestar is calculated."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 755–56 (S.D. Tex. 2008). A district court may "subsume[] in the lodestar amount" the *Johnson* factors, provided the court

---

[5] The *Johnson* factors include: (1) the time and labor required for the litigation; (2) the novelty and complication of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case circumstances imposed any time constraints; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case was "undesirable"; (11) the type of attorney-client relationship and whether that relationship was long-standing; and (12) awards made in similar cases. *Johnson v. Ga. Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974).

does not "double count a . . . factor already considered in calculating the lodestar when it determines the necessary adjustments." *Shipes*, 987 F.2d at 320.

Geophysical pursued its claims past multiple motions to dismiss, a motion for reconsideration, two appeals, and summary judgment. Geophysical also raised a novel, though irrelevant, choice-of-law issue on appeal and remand. The attorneys from Norton Rose Fulbright defended their client vigorously, skillfully, and effectively. Based on all the circumstances and criteria, for the work performed between November 9, 2015, and July 31, 2019, the court finds that Rother's reasonable rate is $580 per hour; Soloway, Mackillop, and Franklin's rates are all $600 per hour; Groos's rate is $500 per hour; Tipps's rate is $450 per hour; Elkhoury and Tarpley's rates are both $250 per hour; White's rate is $200 per hour; and Torres's rate is $125 per hour. This properly accounts for their expertise and experience, the complexity of the case, and the success they achieved. *See id.* (the district court did not err when it reduced the hourly rate to better reflect prevailing market rates but declined to reduce the rate to the extent requested by the nonprevailing party after accounting for four of the *Johnson* factors in the lodestar).

### 2. The Number of Hours Reasonably Expended

A fee application should include "contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998). "Hours that are excessive, redundant, or otherwise unnecessary" are to be excluded, and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (quotation marks omitted). The court may also exclude hours from the lodestar calculation that were not properly documented. *See id.* at 433.

TGS has submitted billing records from Norton Rose Fulbright, along with Rother's affidavit supporting the amount. (Docket Entry Nos. 45-1, 118-2). The billing entries run from November 9, 2015, to July 31, 2019. The entries provide a detailed summary of the amount of time each lawyer spent on various tasks throughout that period. Rother spent a total of 500.9 hours; Soloway, Mackillop, and Franklin spent 75.4 hours; Groos spent 1.8 hours; Elkhoury and Tarpley spent 35.3 hours; White spent 68.2 hours; and Torres spent 2.5 hours. TGS also seeks reinstatement of the $132,888.00 in attorney's fees this court awarded in its vacated order, (Docket Entry No. 51), for hours billed before November 9, 2015.

Geophysical cites *Cashman Equipment Corp. v. Rozel Operating Co.*, 569 F. App'x 283, 289 (5th Cir. 2014), to argue that Rother's affidavit, by itself, is insufficient to show "billing judgment"—a factor in determining a fee award. (Docket Entry No. 123 at 24–25). *Cashman* is inapposite. In *Cashman*, the party seeking attorney's fees submitted only an attorney's affidavit and "block billing entries," rather than original time sheets that gave detailed entries. *Id.* The Fifth Circuit held that the attorney's affidavit, which stated that the attorney exercised billing judgment, was insufficient to demonstrate billing judgment. *Id.* In contrast, TGS has submitted detailed billing records, describing which tasks the attorneys performed and for how long. TGS does not rely on Rother's affidavit, by itself, to show "billing judgment."

Geophysical objects to some billing entries that are partially redacted. As TGS states, it does not seek to recover any entries that have been fully redacted, and it has subtracted those amounts from the total amount requested. The remaining partially redacted entries give sufficient information to assess whether the time spent was reasonable. *See Randolph*, 634 F. Supp. 2d at 800 ("Redaction of billing records is acceptable so long as the court has sufficient information to form an opinion on the reasonableness of the fees.") (citing *Vantage Trailers, Inc. v. Beall Corp.*,

No. 06-3008, 2008 WL 4093691, at *3 n.2 (S.D. Tex. Aug. 28, 2008)). Partially redacted billing entries here show tasks such as reviewing "correspondence on research re the first sale doctrine and briefing from the Supreme Court decision in Quality King"; "review and revise letter motion for an extension of time; conference with Mr. Tipps re TGS's brief; continue to revise outline of brief;" and "correspond with Mr. Tipps re whether evidence that GSI authorized was obtained in Canada." (Docket Entry No. 123-1 at 4, 11, 12). These partially redacted entries show reasonable time spent on these tasks, given that TGS's attorneys had to review Supreme Court precedent and engage in substantial motion practice and discovery.

Geophysical challenges some of TGS's entries as excessive, redundant, or unnecessary. In the excessive category, Geophysical points to eight entries that show three attorneys spending over 30 hours analyzing the Supreme Court's *Kirtsaeng* decision. (Docket Entry No. 123 at 26). The billing entries that include *Kirtsaeng* reveal that TGS's attorneys were reviewing *Kirtsaeng* and other first-sale-doctrine cases. These hours were not spent reviewing only one case, but rather a body of complicated case law.

In the redundant category, Geophysical objects to entries that include conferences about enforcing the vacated fee award and drafting discovery requests. (Docket Entry No. 123 at 27). Examples of the entries that Geophysical labels redundant show that Rother spent about 20 minutes each on two days reviewing Geophysical's extension motion. (Docket Entry No. 123-1 at 3). It is not redundant to quickly review a motion twice. Nor is it redundant to continue outlining a response to an appellate brief from the day before. (*Id.*). Geophysical appears to take the unpersuasive position that work continuing over more than one day must be redundant.

Geophysical unpersuasively argues that any time spent reviewing *Kirtsaeng* and first-sale-doctrine cases should not count because TGS was ultimately unsuccessful on the issue. While the

court agreed with Geophysical that United States law should determine whether copies were lawfully made, TGS ultimately prevailed on its defense. *See Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (when a lawsuit cannot be "viewed as a series of discrete claims," courts should "focus on the significance of the overall relief obtained . . . in relation to the hours reasonably expended on the litigation"); *Cabrales v. Cty. of Los Angeles*, 935 F.2d 1050, 1053 (9th Cir. 1991) ("The County would have us scalpel out attorney's fees for every setback, no matter how temporary, regardless of its relationship to the ultimate disposition of the case. This makes little sense."). This was not a case in which TGS's defense could be neatly divided into discrete parts, making any work relating to unsuccessful parts nonrecoverable. TGS was forced to respond to Geophysical's shifting legal theories in order to eventually defeat all of Geophysical's claims.

Geophysical also argues that some of TGS's entries are "block-bills," precluding the court from determining the amount of time spent on discrete tasks. The Fifth Circuit defines block-billing as "describing multiple activities in only one time entry." *C & D Prod. Servs. v. Dir., Office of Worker's Comp. Programs*, 376 F. App'x 392, 394 (5th Cir. 2010). Block-billed entries do not preclude a fee award, "as long as the evidence produced is adequate to determine reasonable hours." *DeLeon v. Abbott*, 687 F. App'x 340, 346 n.4 (5th Cir. 2017) (Elrod, J., concurring) (quoting *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1044 (5th Cir. 2010)).

The billing entries that Geophysical objects to as block-billed allow the court to determine whether the hours were reasonable. One entry shows that Rother spent 48 minutes reviewing correspondence over a discovery dispute, considering the response strategy, reviewing the protective order, and reviewing correspondence from the court. (Docket Entry No. 123-1 at 24). Another entry shows that Tipps spent 6.3 hours drafting a premotion discovery letter, analyzing the discovery requests and the applicable law, reviewing the implied-license issues, reviewing the

document production and case law, and preparing a summary judgment outline. (*Id.*). The detailed narratives associated with these time blocks do not prevent the court from determining, as a matter of law, that Rother and Tipps spent a reasonable amount of time reviewing discovery requests and preparing for summary judgment.

Finally, Geophysical has challenged some entries as clerical or administrative, but it has not provided any guidance as to why. "Examples of clerical tasks include calendaring, printing, filing, obtaining information about court procedures, and delivering pleadings." *Martinez v. Ref. Terminal Fire Co.*, No. 2:11-CV-295, 2016 WL 4594945, at *6 (S.D. Tex. Sept. 2, 2016) (citing *Ramirez*, 197 F. Supp. 3d at 958–59). According to Geophysical, "preparing for filing" a motion for attorney's fees is noncompensable clerical time, (Docket Entry No. 123-1 at 37), as is updating a case outline with updates in case law, (Docket Entry No. 123-1 at 16). The billing descriptions show that the tasks were legal in nature, not clerical or administrative.

A court is not required to audit the billing records on its own, but the court is required to determine whether the hours are reasonable. *Fox v. Vice*, 563 U.S. 826, 838 (2011). "[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.* Based on careful review, the court concludes that the total number of hours billed by all the associates for research and analysis is unreasonably high. The court reduces the associates' hours by 10 percent, accounting for the fact that the case proceeded past the motion to dismiss stage, through interlocutory appeal, discovery, summary judgment, and another appeal.

Rother's rate is $580 per hour, for 500.9 hours. Soloway, Mackillop, and Franklin's rates are $600 per hour, for a combined 75.4 hours. Groos's rate is $500 per hour, for 1.8 hours. Tipps's rate is $450 per hour, for 862.74 hours. Elkhoury and Tarpley's rates are $250 per hour, for 31.77 hours. White's rate is $200 per hour, for 61.38 hours. Torres's rate is $125 per hour, for 2.5 hours. The lodestar is $745,426.00 for the work performed between November 9, 2015, to July 31, 2019.

The court also reinstates the $132,888.00 in attorney's fees awarded in the vacated January 4, 2016, Memorandum and Order, for work performed before November 9, 2015. (Docket Entry No. 51). That award reduced TGS's attorneys' hourly rates and number of hours as the court found reasonable, considering all the circumstances.

### 3. Adjustments to the Lodestar

After calculating the lodestar, the district court has discretion to adjust the fee award in light of the 12 *Johnson* factors. *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir. 1997); *see supra* note 5 (listing the factors). Geophysical asserts that "many of [the *Johnson*] factors weigh heavily in favor of a reduction in fees." (Docket Entry No. 123 at 25). Geophysical argues that if its claims were truly frivolous, that would require reducing the fee award because it would be unreasonable to spend as many hours as TGS's attorneys did defending a frivolous case. But TGS's attorneys were forced to respond to a motion for reconsideration after they succeeded in dismissing Geophysical's claims, which resulted only in dismissal on different grounds; argue an appeal in which Geophysical raised a novel but irrelevant issue that had to be addressed on remand; conduct discovery on the original implied-license theory on which this court initially dismissed the claims; move for summary judgment on the license theory; successfully argue a second appeal; and move for attorney's fees twice. Geophysical pursued its unreasonable claims at great length

and at high cost to TGS. The unreasonableness of Geophysical's claims does not weigh against awarding attorney's fees.

The case law shows that this fee award is consistent with the range of recent awards to prevailing defendants under § 505 of the Copyright Act. *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 588–89 (5th Cir. 2015) (affirming a $183,000 fee award to the prevailing defendant after a bench trial); *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 411–12 (5th Cir. 2004) (affirming a $2,765,026.90 fee award to the prevailing defendant after a seven-day trial); *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 147–48, 159 (5th Cir. 2004) (per curiam) (affirming two fee awards to the prevailing defendants in one action dismissed on summary judgment and in another action dismissed under Rule 12(b)(6), totaling approximately $448,000).

Having considered the *Johnson* factors, the court concludes that further adjustment to the lodestar is not appropriate. The court awards TGS $745,426.00 in attorney's fees incurred between November 9, 2015, to July 31, 2019, and $132,888.00 in attorney's fees previously awarded, incurred before November 9, 2015.

## III. The Motion for Costs

### A. The Applicable Law

Rule 54 of the Federal Rules of Civil Procedure provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "[T]he word 'should' makes clear that the decision whether to award costs ultimately lies within the sound discretion of the district court." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013). Even if a federal statute does not specifically authorize recovery of costs in a particular case, "Rule 54(d)(1) independently authorizes district courts to award costs to prevailing parties" unless a statute or rule precludes it.

*Id.* at 380 n.5.  The Rule "does not *require* courts to award costs to prevailing [parties]."  *Id.* at 387

n.9.  Rather, it gives the court discretion based on the circumstances each case presents.

A federal statute "defines the term 'costs' as used in Rule 54(d)."  *Crawford Fitting Co. v.*

*J.T. Gibbons, Inc.*, 482 U.S. 437, 441 (1987).  Under 28 U.S.C. § 1920, a district court may tax as

costs:

> (1)  Fees of the clerk and marshal;
>
> (2)  Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3)  Fees and disbursements for printing and witnesses;
>
> (4)  Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5)  Docket fees under section 1923 of this title; [and]
>
> (6)  Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

Absent objection, the court presumes that statutorily authorized costs were necessarily

incurred and will be taxed.  *See Embotelladora Agral Regiomontana, S.A. de C.V. v. Sharp Capital,*

*Inc.*, 952 F. Supp. 415, 417 (N.D. Tex. 1997) ("[I]n the absence of a specific objection, deposition

costs will be taxed as having been necessarily obtained for use in the case.").  An objection shifts

that burden to the party seeking costs to show that otherwise authorized costs were necessary.

*Jerry v. Fluor Corp.*, No. 10-1505, 2012 WL 4664423, at *2 (S.D. Tex. Oct. 2, 2012) (citing

*Fogleman v. ARAMCO*, 920 F.2d 278, 286 (5th Cir. 1991)).  The "costs taxable under § 505 are

limited to those enumerated in § 1920."  *Tempest Publ'g, Inc. v. Hacienda Records & Recording*

*Studio, Inc.*, 141 F. Supp. 3d 712, 723 (S.D. Tex. Oct. 2015).

### B.    The Award of Costs

TGS seeks $3,931.80 in costs under § 1920, incurred between November 9, 2015, to July 31, 2019, as well as $236.95 in costs previously awarded by this court, incurred before November 9, 2015.  (Docket Entry No. 118 at 16).  Geophysical objects to TGS's costs because "TGS has failed to substantiate that the costs claimed were 'necessarily obtained for use in the case' as [28 U.S.C. § 1920] requires."  (Docket Entry No. 123 at 30).  Geophysical again cites *Cashman*, 569 F. App'x at 289, to argue that Rother's affidavit is insufficient to verify the costs.  Geophysical's arguments are unpersuasive.  TGS has specified the costs it seeks, which are limited to those enumerated in § 1920, and Rother has stated in her affidavit, and provided support stating, that the costs were "necessarily incurred" in the litigation.  (Docket Entry No. 118-2 at 5, 7–9).  *See United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 574–75 (5th Cir. 2005) (the district court did not abuse its discretion by awarding costs when counsel provided a declaration under penalty of perjury that "the costs were correct and 'necessarily incurred in this action'").

TGS's motion for costs is granted.  The court awards TGS $3,931.80 in taxable costs incurred from November 9, 2015, to July 31, 2019, and $236.95 in costs that this court previously awarded, incurred before November 9, 2015.

## IV.    Conclusion

The court grants in part and denies in part TGS's motion for attorney's fees and costs, (Docket Entry No. 118), awarding $878,314.00 in attorney's fees and $4,168.75 in taxable costs.

SIGNED on February 19, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge